[No. A073121. First Dist., Div. Four. Feb. 18, 1997.]

ODELIA S. BRAUN, Plaintiff and Appellant, v.
CHRONICLE PUBLISHING COMPANY et al., Defendants and
Respondents.

COUNSEL

Lawless, Horowitz & Lawless, Barbara A. Lawless and Carol Belcher for Plaintiff and Appellant.

Landels, Ripley & Diamond, Neil L. Shapiro and Mark D. Johnson for Defendants and Respondents.

OPINION

POCHÉ, J.—This appeal concerns the scope of two, sometimes interrelated, statutes: the anti-SLAPP[1] statute, Code of Civil Procedure section 425.16 (section 425.16), and the reporter's privilege found at Civil Code section 47, subdivision (d). The triggering event in this litigation was the publication of five news reports stemming from allegations of illegal and improper management of the Center for Pre-Hospital Research and Training (CPRT) at the University of California at San Francisco (UCSF). In particular, the news reports described an investigative audit carried out by the State Auditor, as well as a background audit and "whistle-blower letter" that disclosed various levels of malfunctioning and malfeasance in the CPRT program.

Odelia Braun, M.D., sued the Chronicle Publishing Company (Chronicle), reporter Ben Wildavsky (respondents) and others for defamation and a multitude of other torts. Respondents Chronicle and Wildavsky successfully employed section 425.16 to strike the claims against them. On appeal Braun urges that the statute does not apply to the stricken claims and even if it did, the court erred in striking them because she demonstrated a probability of prevailing on the merits. We disagree with Braun and, accordingly, affirm the judgment.

## I. FACTS

The CPRT was founded in 1987 as an activity within the UCSF Department of Medicine to support emergency medical services in the community. Dr. Braun served as medical director of the center from inception until closure in December 1994.

Following receipt of complaints of mismanagement of CPRT, Floyd Rector, M.D., chair of the department of medicine, retained Maybruck Associates to review CPRT's contracts and operations. Maybruck released a

---

[1]SLAPP is an acronym for strategic lawsuit against public participation. (*Lafayette Morehouse, Inc.* v. *Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 858 [44 Cal.Rptr.2d 46].)

report in October 1992 which detailed numerous irregularities in CPRT's operations. However, Dr. Rector did not make the report public, nor did he disseminate it within university channels, e.g., to the audit committee of the Board of Regents, office of the president, university auditor, UCSF internal audit staff or the university external auditors.

Then in February 1993 an instructor for the San Francisco Fire Department (SFFD) Medical Training Program, which contracts its medical training to CPRT, sent a "whistle-blower" letter to Dr. Rector confirming their conversation about various business practices within CPRT that were of concern to her. These included misuse of SFFD training contract funds and billing SFFD for work not performed.

That August, Braun sued two of her colleagues at UCSF for slander, infliction of emotional distress and interference with business relations. At the heart of her complaint were allegations that the defendants made false statements to various persons charging her with seriously mismanaging the finances of CPRT, misappropriating CPRT funds and encouraging CPRT personnel to misappropriate funds. Braun also alleged that defendants hired an outside auditor to review and scrutinize CPRT.

Eventually employees of UCSF lodged allegations with the Bureau of State Audits (State Auditor) pursuant to the Reporting of Improper Governmental Activities Act[2] to the effect that: (1) CPRT was improperly spending state and donor-generated funds; (2) the center was paying for expenses out of a secret, unauthorized checking account; and (3) there were improprieties in the contracts with the SFFD.

In early 1994 the State Auditor commenced its investigative audit of CPRT. That July, the State Auditor requested that counsel for the Board of Regents obtain the assistance of UCSF to access CPRT computer files containing payroll information related to falsification of hours. After counsel refused assistance, an investigator for the State Auditor sought and obtained a search warrant, which resulted in seizure of various records. The State Auditor issued his report on November 22. Thereafter the university terminated Braun and closed the CPRT, due to "lack of funds."

Meanwhile, the Chronicle published five articles in 1994, about the State Auditor's probe of CPRT and events leading up to that investigation.[3] Four of the five articles were penned by Ben Wildavsky.

---

[2]Government Code section 8547 et seq.

[3]They were as follows: (1) August 15, reporting that the State Auditor was investigating whistle-blowing allegations of fraud and misuse of state funds at CPRT, and delving back to

In addition to respondents, Braun has prosecuted the present lawsuit against UCSF, the Board of Regents, Maybruck Associates, and a host of former professional colleagues. She has alleged 10 causes of action, ranging from sex discrimination and breach of contract and of the covenant of good faith to defamation and intentional and negligent infliction of emotional distress. This appeal followed the granting of respondents' motion to strike under section 425.16.

## II. DISCUSSION

### A. *Background*

The anti-SLAPP statute is designed to nip SLAPP litigation in the bud by striking offending causes of actions which "chill the valid exercise of the constitutional rights of freedom of speech and petition . . . ." (§ 425.16, subd. (a).) Finding a "disturbing increase" in such lawsuits, the Legislature has declared it in the public interest "to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process." (*Ibid.*)

Thus, where a cause of action arises "from any act" of a person "in furtherance of the person's right of petition or free speech . . . in connection with a public issue," that cause is subject to a motion to strike, unless the plaintiff establishes a probability of prevailing on the claim. (§ 425.16, subd. (b).) Acts "in furtherance of a person's right of petition or free speech . . . in connection with a public issue" are defined as including: "[(1)] any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; [(2)] *any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law*; or [(3)] any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." (*Id.*, subd. (e), italics added.)

■ The defendant pursuing an anti-SLAPP motion must make an initial prima facie showing that plaintiff's suit arises from an act in furtherance of

the 1992 Maybruck audit and UCSF's inaction in the face of its revelations; (2) August 16, relating the Board of Regent's reactions to the failure of UCSF staff to circulate the Maybruck audit to high level officials; (3) August 20, reporting on execution of the search warrant and seizure of time sheets and computers; indicating that the San Francisco District Attorney had opened a criminal investigation of the center; and describing the focal areas of the State Auditor's investigation; (4) August 26, relating 1993 whistle-blower charges of payroll padding and recapping aspects of the search warrant and resulting seizures; and (5) November 23, summarizing the findings of the State Auditor's report.

defendant's right of petition or free speech. (*Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 820 [33 Cal.Rptr.2d 446].) A defendant meets this burden by demonstrating that the act underlying the plaintiff's cause fits one of the categories spelled out in section 425.16, subdivision (e) (quoted above). (27 Cal.App.4th at p. 820.)

Braun first urges that her claims are outside the ambit of section 425.16 because respondents' underlying actions did not further either the exercise of their petition rights or their free speech rights in a public forum. Next, she is adamant that the reported matters did not amount to a "public" issue. Finally, Braun insists that even if respondents could make out a prima facie case under section 425.16, she would be able to counter that case with her own showing of facts establishing a probability of prevailing at trial. These contentions are not compelling.

## B. *Analysis*

### (1) *The Chronicle and Its Reporter Were Acting in Furtherance of Their Free Speech Rights Within the Meaning of Section 425.16, Subdivision (e).*

Throughout this litigation, the Chronicle and its reporter have maintained that their published reports constitute acts in furtherance of their free speech rights within the meaning of section 425.16, subdivision (e). In particular they reason that these reports fall squarely within the second clause of subdivision (e) as "writing[s] made in connection with an issue under consideration or review by . . . any other official proceeding authorized by law"—namely, the state investigatory audit. We agree.

Under the plain terms of section 425.16, the motion to strike remedy can be employed only where the plaintiff has launched litigation stemming from "any act . . . in furtherance of the [defendant's] right of petition or free speech . . . in connection with a public issue." (§ 425.16, subd. (b).) Subdivision (e), in turn, gives definitional contour to the entire "act in furtherance" phrase.

Under the first clause of section 425.16, subdivision (e), the qualifying act is *any* statement or writing made before a legislative, executive or judicial proceeding. For the second clause, all that is needed is that the statement or writing be made "in connection with an issue under consideration or review by a legislative, executive or judicial body, or any other official proceeding authorized by law." To fit under the third clause, the statement or writing must be made in a public forum or place, and must relate to an issue of "public interest."

These statutory requirements are straightforward and unambiguous. The confusion has come with case law that misreads and then needlessly misinterprets the statute. Braun relies on two cases: (1) *Church of Scientology* v. *Wollersheim* (1996) 42 Cal.App.4th 628 [49 Cal.Rptr.2d 620] (*Wollersheim*); and (2) *Zhao* v. *Wong* (1996) 48 Cal.App.4th 1114 [55 Cal.Rptr.2d 909] (*Zhao*).

### (a) *Wollersheim*

In *Wollersheim*, the act fueling the plaintiff's SLAPP suit was the defendant's exercise of petition rights, in particular his successful prosecution of tort claims against his former church, the Church of Scientology. Throughout the underlying litigation, the church engaged in a pattern of conduct designed to frustrate the litigation. Then, after pursuing various appellate remedies, the church sought to set aside the judgment on grounds of judicial bias during trial. Defendant parried with a motion to strike pursuant to section 425.16.

Among other points, the court in *Wollersheim* posed the question whether a tort action against a private party was a matter of public interest that would qualify for statutory protection under section 425.16, subdivision (e). The court had this to say: "Subdivision (e), describing protected activity, refers to three categories; only the category of activity referred to as the 'exercise of free speech rights' is subject to the limitation that it be 'made in a place open to the public or a public forum in connection with an issue of public interest.'[4] The first two categories parallel the description of privileged communications in Civil Code section 47, subdivision (b) and include judicial proceedings without any limitation as to subject matter." (*Wollersheim, supra,* 42 Cal.App.4th at p. 650, fn. omitted.)

Seizing on this passage, Braun asserts that *Wollersheim* stands for the proposition that the first two categories in section 425.16, subdivision (e) are restricted to petition clause activities. Therefore, she reasons, these clauses provide no shelter for respondents in their free speech activity in publishing the five news reports. If and to the extent *Wollersheim* stands for this proposition, it is wrong. First, there is nothing in the statute to imply that the first and second clauses—concerning writings or statements made (1) *before* the defined official proceedings, or (2) *in connection with* matters under review or consideration by the defined body or proceeding—embrace only

---

[4]We agree with the observation that the final clause of subdivision (e) of section 425.16 is the only category of activity with the public place—forum/public interest limitation. However, the clause does *not* single out free speech rights. One could also petition for redress of grievances in a public place, and in such instance the petitioning effort would also have to pass the public interest test.

petitioning activity, to the exclusion of free speech. In fact, the plain wording of the statute specifically includes both. Second, *Wollersheim* is a petition case. It did not raise any issue as to whether the second clause of subdivision (e) could also pertain to free speech and thus *Wollersheim* is dicta on this issue.

The opinion in *Lafayette Morehouse, Inc.* v. *Chronicle Publishing Co.*, *supra*, 37 Cal.App.4th 855 correctly resolves this question in the affirmative. The newspaper articles at issue in *Morehouse* reported on a dispute between an alternative university and its neighbors over the school's decision to open its property to the homeless, and on related hearings before the county board of supervisors, the county's enforcement action and the school's responsive federal suit. These reports were "clearly united by dependence on or relation to" the official actions they described, and therefore comprised protected writings " 'made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law. . . .' " (*Id.* at p. 863.)

More to the point, the court held that news reporting activity is "free speech" and section 425.16 motions can apply to media defendants in libel actions. (*Morehouse, supra*, 37 Cal.App.4th at p. 864.) Thus, the court in *Morehouse* correctly avoided limiting section 425.16, subdivision (e), clause two to petitioning activity.

### (b) *Zhao*

Braun also argues that the recent opinion in *Zhao* correctly confines protected free speech activities to those "intended to further the focus on petition-clause related activities." The defendant in *Zhao* allegedly made certain remarks to a newspaper reporter suggesting that the plaintiff killed the defendant's brother and forged the brother's will. After the newspaper published an article on the brother's mysterious death and ensuing coroner's investigation, plaintiff served defendant with a complaint alleging slander. Moving to strike the complaint under section 425.16, defendant sought to elevate his remarks to the reporter to a public issue by linking the press interview with the pending will contest—to which he was not a party—and with the coroner's investigation. The trial court agreed, but not the Court of Appeal. (*Zhao, supra*, 48 Cal.App.4th at p. 1133.)

The Court of Appeal first took pains to point out that media coverage, by itself, cannot "create an issue of public interest within the statutory meaning." (*Zhao, supra*, 48 Cal.App.4th at pp. 1121-1122, 1131.) It found that term to be reserved for matters "occupying 'the highest rung of the hierarchy

[*sic*] of First Amendment values,' that is, to speech pertaining to the exercise of democratic self-government." (*Id.* at p. 1122.) The court gave the same treatment to the term "public issue": "The existence of a public issue depends . . . on whether the statements possessed the sort of relevance to self-government that places them in a specially protected category of First Amendment values . . . ." (*Id.* at p. 1132.)

Summing up what it found to be the legislative history of section 425.16, the appellate court concluded it "emphasizes the legislative intent to safeguard activities protected by the petition clause with a particularly clear focus on expressive conduct for which the right of freedom of speech offers an alternative protection. The statute represents a clear recognition of the need to provide maximum protection of a citizen's right to exercise free speech and petition where such rights are exercised in relation to issues of public concern." (*Zhao, supra,* 48 Cal.App.4th at p. 1125.)

Then, turning its attention to the second clause of section 425.16, subdivision (e)—i.e., statements or writings made "in connection with an issue under consideration or review" by any official proceeding—the court remarked that this statutory language was difficult to construe in the context of the statute's express legislative purpose. It held that the clause's application was limited "to the narrow sphere of activity, described in the statement of legislative purpose, involving the exercise of a citizen's rights under the petition clause and related areas protected by the right of freedom of speech." (*Zhao, supra,* 48 Cal.App.4th at p. 1127.)

Braun argues on the basis of the above quoted excerpts that because the Chronicle was not engaged in petition-related activity on its own behalf or in free speech efforts furthering petition-related activity, the five news reports do not qualify for anti-SLAPP protection. We disagree with Braun for two reasons.

First, we part ways with the *Zhao* determination that section 425.16, subdivision (e), clause two does not protect free speech activities which are unrelated to petitioning efforts. We agree with *Morehouse* that within the scope of this clause are news reports made in connection with an issue under consideration or review by an authorized official proceeding which reports are published by media defendants. Further, news reporting activity *is* free speech. Nothing in any portion of subdivision (e), which is unambiguous on its face, confines free speech to speech which furthers the exercise of petition rights.

Second, *Zhao* is incorrect in its assertion that the only activities qualifying for statutory protection are those which meet the lofty standard of pertaining

to the heart of self-government.[5] At least as to acts covered by clauses one and two of section 425.16, subdivision (e), the statute requires simply *any* writing or statement made in, or in connection with an issue under consideration or review by, the specified proceeding or body. Thus these clauses safeguard free speech and petition conduct aimed at advancing self government, as well as conduct aimed at more mundane pursuits. Under the plain terms of the statute it is the context or setting itself that makes the issue a public issue: all that matters is that the First Amendment activity take place in an official proceeding or be made in connection with an issue being reviewed by an official proceeding.

The answer to *Zhao's* concern over how to harmonize the language of section 425.16, subdivision (e), clause two with the statement of legislative intent contained in subdivision (a) is now apparent: The Legislature when crafting the clause two definition clearly and unambiguously resorted to an easily understandable concept of what constitutes a public issue. Specifically, it *equated* a public issue with the authorized official proceeding to which it connects. How do we then match this concept of a public issue with the declaration of legislative purpose to "encourage continued participation in *matters of public significance* . . . ."? (§ 425.16, subd. (a), italics added.)

---

[5]For the record, we take issue with Braun's portrayal of the press coverage. While the Chronicle was not exerting its *own* petition rights, it *was* advancing the "highest rung" of First Amendment values. As the Chronicle points out, Braun ignores the crucial role of the press in *informing* the citizenry, so that it can responsibly engage in self-governance. "The free press has been a mighty catalyst in awakening public interest in governmental affairs, exposing corruption among public officers and employees and generally informing the citizenry of public events and occurrences . . . ." (*Estes* v. *State of Texas* (1965) 381 U.S. 532, 539 [85 S.Ct. 1628, 1631, 14 L.Ed.2d 543].)

It bears noting that none of the complained of events and allegations would have come about had it not been for whistle-blowing employees complaining first to their department head and then to the State Auditor that all was not well within CPRT. The center was a recognized branch of a large, publicly funded university medical school and performed a public training function. Without question its financial well-being and integrity were legitimate matters of public concern, especially when called into question by the people most closely affected—its employees. Along the way, important public officials within the university system were left out of the loop until matters reached the level of an investigation by the State Auditor. Surely all these people were acting within their petition rights to uncover and correct a situation of alleged extreme mismanagement or even criminal wrongdoing.

In this regard we point out that the Reporting of Improper Governmental Activities Act, pursuant to which the allegations in this case were lodged with the State Auditor, is a statutory vehicle by which state employees can exercise their petition rights. The purpose of the act is to permit state employees to disclose improper governmental activities to the State Auditor. (Gov. Code, §§ 8547.1, 8547.5.) The State Auditor, in turn, has authority to conduct an investigative audit into the matter; report the nature and details of improper activities to the appropriate agency and, where appropriate, to the Attorney General; issue reports on substantiated investigations; and release findings resulting from investigations as is deemed necessary to serve the interests of the state. (Gov. Code, § 8547.7.)

The term "significance" supports multiple meanings. It can mean "[t]he meaning or import *of* something." (15 Oxford English Dict. (2d ed. 1989) p. 458.) It can also mean "[i]mportance, consequence." (*Ibid.*) ██ ██ Our rules of statutory construction teach us that we must construe a statute or provision thereof with reference to the entire scheme to which it belongs so that all parts may be harmonized and have effect. (*Stafford* v. *Realty Bond Service Corp.* (1952) 39 Cal.2d 797, 805 [249 P.2d 241]; see also *DuBois* v. *Workers' Comp. Appeals Bd.* (1993) 5 Cal.4th 382, 388 [20 Cal.Rptr.2d 523, 853 P.2d 978].) Moreover, " 'where there are conflicting provisions, the one susceptible to only one meaning will control the one that is susceptible of two meanings, if the statute can thereby be made harmonious.' " (*Wheeler* v. *Board of Administration* (1979) 25 Cal.3d 600, 606 [159 Cal.Rptr. 336, 601 P.2d 568].)

With these principles in mind, it is apparent that legislative intent is not gleaned solely from the preamble of a statute; it is gleaned from the statute as a whole, which includes the particular directives. This being the case, the meaning ascribed to the concept of "public significance" in the preamble must accommodate the singular, clearly defined protected activities set forth in each clause of section 425.16 subdivision (e). To harmonize the two provisions, the term "significance" should be read as simply the meaning or import of a particular matter. Thus a matter has *public* meaning or significance within the language of section 425.16, subdivision (a) because and solely because (1) it occurs within the context of the proceedings delineated in clause one (i.e. "any statement or writing made before . . . ."); or (2) it occurs in connection with an issue under consideration or review by one of the bodies or proceedings delineated in clause two; or (3) it is an issue of public interest that is aired to the public or in a public forum.

### (2) *The Articles Reported on "Public" Issues*

██ Next, Braun argues that the Chronicle was not reporting on matters that were "in connection with a public issue" because the actual audit was confidential. In her opinion, the Chronicle instead was reporting on the results of its *own* investigation into her employment situation and related *internal* matters at UCSF.

Braun misses the point. To reiterate, clause two of section 425.16, subdivision (e) defines an act in furtherance of free speech rights "in connection with a [public] issue" as "*any*" writing made "in connection with an issue under consideration or review by" any official proceeding authorized by law. (Italics added.) The investigative audit, conducted by the State Auditor, is an authorized official proceeding. (Gov. Code, § 8547 et seq.) The Chronicle

articles were made "in connection with" this proceeding: They reported that the investigation was being conducted, its subject matter, the documents gathered and relied on by the investigators, as well as the execution of the search warrant. While the investigative audit itself is confidential (Gov. Code, § 8547.7, subd. (c)), these topics and events are not.

Nor does the confidentiality of the audit transmute it into an unofficial or nonpublic activity. True, the investigation itself is closed to the public, but it is an authorized, public proceeding because it is government-sponsored and provided for by statute.

Braun also contends that the articles could not have been made in connection with a public issue "under consideration or review" by an official proceeding because the powers of the State Auditor are investigatory only, there being no additional power to review or consider issues. She emphasizes that the State Auditor has no enforcement powers (Gov. Code, § 8547.7, subd. (b)) and no statutory authorization to conduct hearings or make binding findings of fact. This being the case, to Braun it is "axiomatic" that a matter under investigation by the State Auditor is not "under consideration or review" within the meaning of section 425.16, subdivision (e) and, hence, cannot rise to the level of a public issue encompassed by the anti-SLAPP statute.

The phrase "under consideration or review" is not so confining as to exclude an investigative audit, carried out by a funded and independent state bureau, with subpoena authority and authority to seek assistance from other state agencies and to report on substantiated findings. (Gov. Code, §§ 8543, 8544.5, 8545.4, 8546, 8547.6, 8547.7.) To the contrary, a matter under consideration is one kept "before the mind", given "attentive thought, reflection, meditation." (3 Oxford English Dict., *supra*, p. 769.) A matter under review is one subject to "an inspection, examination." (13 Oxford English Dict., *supra*, p. 830.) Against these definitions, surely the alleged governmental impropriety is "under consideration or review" by the Bureau of State Audits when subjected to an investigative audit.

### (3) *Braun Cannot Prevail on Her Claims*

■ Braun also insists that she will probably prevail on her claims against the Chronicle and its reporter because she can defeat application of Civil Code section 47, thereby destroying their privilege. Once the privilege is gone, Braun contends she can make out a prima facie case of liability against the Chronicle and escape the anti-SLAPP provisions. However, as we explain, Civil Code section 47 *does* apply to defeat Braun's claim.

This statute establishes a news media privilege for publications made "[b]y a fair and true report in, or a communication to, a public journal, of (A) a judicial, (B) legislative, or (C) other public official proceeding, or (D) of anything said in the course thereof . . . ." (Civ. Code, § 47, subd. (d).)

Braun's quarrels with Civil Code section 47 largely repeat her quarrels with section 425.16. First, she asserts that the Chronicle did not and could not report on the actual investigative audit because that investigation was confidential. Therefore, she concludes the privilege is not available.

Again, it is immaterial that the audit itself was confidential.[6] In the context of judicial proceedings, case law is clear that reports which comprise a *history* of the proceeding come within the privilege, as do statements made outside the courtroom and invoking no function of the court, e.g., representations and theories expressed by criminal justice personnel in relation to pretrial events such as pursuit and arrest of the defendant. (*Hayward* v. *Watsonville Register-Pajaronian and Sun* (1968) 265 Cal.App.2d 255, 259-260 [71 Cal.Rptr. 295].) We see no reason why the breathing room afforded the press for explaining the basis and background of a judicial proceeding should not be equally available for exposing the basis and background of a "public official proceeding." Nothing in the language of the statute provides a basis to distinguish between the two on this point.

---

[6]Braun makes much of the fact that the search warrant, affidavit and documents produced in response to the warrant were sealed until 10 days after the State Auditor issued his report. Hence, she argues, the Chronicle's assertion of privilege could not rest on reports of matters contained therein. Braun is barking up the wrong tree. When and how the Chronicle learned that a search warrant was sought, issued and executed, and that certain fruits were forthcoming, are not in issue. What does matter is whether the Chronicle published a "fair and true" account of these events and whether they related to a "public official proceeding." They did and they do.

Braun also quibbles with the Chronicle's report that the *district attorney* opened a criminal probe of the CPRT, pointing out that the *State Auditor* requested the warrant, not the district attorney, and only the district attorney can open a criminal investigation. So what? If Braun's point is that the article was not a true and fair report, she is wrong. The test is whether the report "captures the substance, the 'gist' or 'sting' of the subject proceedings." (*Kilgore* v. *Younger* (1982) 30 Cal.3d 770, 777 [180 Cal.Rptr. 657, 640 P.2d 793].) This test measures the publication by its " 'natural and probable effect' " " 'on the mind of the average reader.' " (*Ibid.*) The article would pass this test. Whether or not the district attorney "opened" a criminal investigation, the truth is that the State Auditor was investigating alleged criminal wrongdoing and the affiant for the search warrant declared he had disclosed all material information, favorable or unfavorable, to the district attorney. Additionally, the affiant expressed his own opinion that there was probable cause to believe that felony violations had occurred. Finally, Braun does not dispute that representatives of the district attorney's office were present during the search. What would strike the average reader is the "sting" that public officials were probing government wrongdoing, and had to resort to a search warrant to secure certain documents.

The articles in question detail the fact that the State Auditor was conducting an investigation of CPRT; the conduct of that investigation and statements made by various persons affected by or concerned with the subject of the audit; the substance of the background reports and charges leading up to the investigation; and a summary of the findings that ultimately issued. These reports constitute a history of the investigative audit conducted by the State Auditor; the reported activities were newsworthy and the public was entitled to information about them. The articles come squarely within the Civil Code section 47, subdivision (d), privilege for reports of "public official proceedings."

Second, Braun insists that an investigative audit pursuant to the Reporting of Improper Governmental Activities Act is not an "official proceeding" for purposes of Civil Code section 47, subdivision (d). She relies on *Fenelon v. Superior Court* (1990) 223 Cal.App.3d 1476 [273 Cal.Rptr. 367], a case involving the definition of "official proceeding[s]" in Civil Code section 47, subdivision (b) (publications/broadcasts made in legislative, judicial or "any other official proceeding") in which the majority refused to apply the privilege to an allegedly false report of crime to the police. In the majority's view, the embrace of " 'official proceeding[s]' " does not reach beyond proceedings which resemble judicial and legislative proceedings. (*Fenelon v. Superior Court, supra*, at p. 1480.)

Since the act does not provide for enforcement powers or the conduct of evidentiary hearings, it lacks the necessary *Fenelon* hallmarks. However, as the dissent in *Fenelon* points out, the majority's definition is "unduly narrow" and is also inconsistent with relevant case law. (*Fenelon v. Superior Court, supra*, 223 Cal.App.3d at pp. 1484-1487.) We have found no reported cases which have followed *Fenelon*; to the contrary it has been criticized regularly. (*Hunsucker v. Sunnyvale Hilton Inn* (1994) 23 Cal.App.4th 1498, 1502-1503 [28 Cal.Rptr.2d 722]; *Passman v. Torkan* (1995) 34 Cal.App.4th 607, 618-619 [40 Cal.Rptr.2d 291].)

Third, Braun is unshakable in her view that the investigation cannot fit the bill of a "public official proceeding" because it was closed to the public. However, courts *have* extended Civil Code section 47, subdivision (d) protection to confidential proceedings. For example, in *Reeves v. American Broadcasting Companies, Inc.* (2d Cir. 1983) 719 F.2d 602, the reviewing court held that the privilege for press coverage of "judicial proceedings" encompasses press accounts of secret proceedings, in that case a grand jury inquiry. (*Id.* at p. 606.)

Even closer to home, in *Crane v. The Arizona Republic* (9th Cir. 1992) 972 F.2d 1511, 1518, the Ninth Circuit concluded that a closed investigation by

a congressional committee qualified for protection irrespective of whether it was denominated a "legislative" or "public official" proceeding. Reviewing the pertinent case law and applying principles of statutory construction, the court concluded that an interpretation of "public official proceeding[s]" that would cabin the privilege to meetings and proceedings that were "open to the public" would go against the spirit animating Civil Code section 47, subdivision (d). (*Crane, supra,* at pp. 1518-1519.) "Citizens cannot monitor their government when it conducts business behind closed doors. As [case law has] interpreted the phrase, 'public' would appear to mean 'governmental' as opposed to private actions. 'Official' apparently signifies formal, as opposed to informal, governmental proceedings. This definition reconciles the [pertinent] cases with the statutory language in a manner that most generously accommodates the public's right to know about the inner-workings of its government." (*Id.* at p. 1518.)

For these reasons we conclude that the investigation qualified as an "official public proceeding" within the meaning of Civil Code section 47, subdivision (d).

### (4) *The Trial Court Did Not Abuse Its Discretion in Denying Discovery and Awarding Attorney Fees*

██ The filing of a motion to strike under the anti-SLAPP statute suspends discovery. (§ 425.16, subd. (g).) However, on noticed motion and for good cause, the court "may order that specified discovery be conducted." (*Ibid.*)

Braun orally requested discovery at the hearing on the Chronicle's section 425.16 motion. She now complains the court unfairly denied this request. But hers was not a timely and properly noticed motion for discovery, supported by a showing of good cause. Braun's failure to comply with subdivision (g) dooms the discovery request. (*Evans* v. *Unkow* (1995) 38 Cal.App.4th 1490, 1499 [45 Cal.Rptr.2d 624]; *Robertson* v. *Rodriguez* (1995) 36 Cal.App.4th 347, 357 [42 Cal.Rptr.2d 464].)

Section 425.16 also provides that the prevailing defendant is entitled to attorney fees and costs. (*Id.,* subd. (c).) The court awarded the Chronicle $17,879 in fees and $599 in costs. Braun's parting argument is that under the facts of the case, particularly where the defendant is "a media defendant," the losing plaintiff should not be forced to pay. She cites no authority for this proposition, and the statute clearly is to the contrary. Nor has she presented

any evidence that the award was based on unnecessary or duplicative work or any other improper basis. The award will stand. (*Wollersheim, supra*, 42 Cal.App.4th at pp. 658-659.)

We affirm the judgment.

Anderson, P. J., and Hanlon, J., concurred.

A petition for a rehearing was denied March 18, 1997, and appellant's petition for review by the Supreme Court was denied June 11, 1997. Chin, J., was of the opinion that the petition should be granted.