Filed 4/23/14  Sparks v. Associated Press CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| PHIL SPARKS, | B250473 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC503090) |
| v. | |
| ASSOCIATED PRESS, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Rolf M. Treu, Judge.  Affirmed.

Phil Sparks, in pro. per., for Plaintiff and Appellant.

Davis Wright Tremaine, Kelli L. Sager, and Jonathan L. Segal for Defendant and Respondent.

_____

Appellant Phil Sparks appeals from the trial court's order granting the special motion to strike brought by respondent Associated Press (AP) pursuant to Code of Civil Procedure section 425.16.[1]  Following the AP's publication of two articles reporting on civil restraining orders that were issued against Sparks, Sparks filed this action against the AP for defamation and intentional infliction of emotional distress.  The trial court granted the AP's special motion to strike on the grounds that the claims alleged arose from acts in furtherance of the constitutional right of free speech and Sparks failed to prove a probability of prevailing on the merits.  We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I.  The AP's Published Articles

On July 31, 2012, the AP published a news article about a temporary restraining order that had been issued against Sparks for allegedly making threats against singer Sheryl Crow.  That article specifically stated:  "A judge has granted Sheryl Crow a temporary restraining order against a man who is accused of threatening to shoot the Grammy-winning singer-songwriter.  [¶] The order requires Phillip Gordon Sparks, 45, to stay 100 yards away and not attempt to contact Crow, her family or any of her workers.  She wrote in a sworn statement that she is fearful of Sparks because he has claimed in profane online tirades that she has stolen money from him and broken into his house.  [¶] She also states Sparks recently went to the offices of an entertainment union and told a worker that he was going to 'just shoot' her."

The July 31, 2012 article further provided:  "A worker at the Screen Actors Guild-American Federation of Television and Radio Artists wrote in a declaration accompanying Crow's filing that she spoke with Sparks on July 16 and he made the threat against Crow.  He also threatened to shoot film executive Weinstein because he believed they were filming him and had stolen millions from him, the worker stated."

---

[1]     Unless otherwise stated, all further statutory references are to the Code of Civil Procedure.

The article noted that the temporary restraining order was granted on July 24, and that a hearing on a three-year protective order was scheduled for August 14. It also stated that attempts to contact Sparks had been unsuccessful.

On August 14, 2012, the AP published a second news article about the issuance of a three-year restraining order against Sparks. That article stated, in pertinent part: "A judge granted Sheryl Crow a three-year restraining order against a man who acknowledged he threatened to shoot the singer-songwriter and film executive Harvey Weinstein. [¶] Philip Gordon Sparks, 45, agreed to stay away from the Grammy winner and Weinstein after an hour-long hearing in which he accused the pair of stealing $7.5 million from him, videotaping and following him without permission and leaving him homeless. A forensic psychiatrist who interviewed Sparks recently called him 'imminently dangerous' and said his psychosis is directed intently at Crow. [¶] Superior Court Judge James Hahn ordered Sparks to stay 300 yards away from Crow and Weinstein and make no attempt to contact them."

Like the AP's prior article, the August 14, 2012 article referenced the declaration that was submitted by the Screen Actors Guild employee and the statement in that declaration that Sparks had threatened to shoot Crow and Weinstein. The article also reported as follows: "Sparks said he made the statement because he was frustrated because he believes they stole from him and continued to follow him. [¶] 'Mr. Sparks is unambiguously delusional,' forensic psychiatrist Dr. David Glaser testified during the hearing. [¶] Neither Crow nor Weinstein attended the hearing."

## II.    Sparks's Civil Lawsuits Against the AP[2]

On November 13, 2012, Sparks filed his first civil action against the AP in Los Angeles County Superior Court (Case No. BC495593). The complaint asserted a single cause of action for defamation based on the AP's publication of the August 14, 2012

---

[2]    According to a declaration submitted by the AP's counsel, Sparks has filed at least seven other lawsuits against media organizations apart from the AP, three of which have been dismissed by the trial courts under section 425.16.

article. On February 22, 2013, the trial court granted the AP's special motion to strike the complaint on the grounds that Sparks's defamation claim was barred as a matter of law by the fair report privilege of Civil Code section 47, subdivision (d), and by Sparks's failure to demand a retraction or to prove special damages under Civil Code section 48a. The trial court entered a judgment in favor of the AP on March 18, 2013.

On March 15, 2013, Sparks filed this action against the AP in Los Angeles County Superior Court (Case No. BC503090). The complaint asserted two causes of action for defamation and intentional infliction of emotional distress based on the AP's publication of the July 31, 2012 and August 14, 2012 articles. Sparks alleged that the AP falsely and maliciously published in its articles that a union representative had stated that Sparks threatened to shoot Crow and Weinstein, and that a forensic psychiatrist had interviewed Sparks and diagnosed him as "imminently dangerous" and "unambiguously delusional." Sparks sought compensatory and punitive damages, and injunctive relief.

### III.    The AP's Special Motion to Strike the Complaint

On May 20, 2013, the AP filed and served a special motion to strike Sparks's complaint. Due to an inadvertent error, however, the caption page on the notice of motion incorrectly listed the case number of the prior action that Sparks had filed against the AP. On June 10, 2013, after discovering the error, the AP filed and served a notice of errata along with a copy of its motion with the corrected case number. On June 18, 2013, Sparks filed an opposition to the special motion to strike. The hearing on the motion was scheduled for June 19, 2013.

At the June 19, 2013 hearing, Sparks appeared and objected to the AP's motion on the ground that it originally listed the incorrect case number. The trial court ordered that the correct case number be interlineated on the AP's motion, continued the hearing to July 24, 2013, and offered Sparks the opportunity to file a new opposition. Sparks indicated that the brief he had filed the day before was sufficient to constitute his opposition on the merits, and the trial court agreed to accept that filing as Sparks's opposition.

4

At the July 24, 2013 hearing, Sparks again appeared and argued that the AP's motion should be denied because he had shown a probability of prevailing on the merits of his claims. Following the hearing, the trial court granted the special motion to strike. The court specifically found that the AP's publication of the articles constituted protected activity under section 425.16, subdivisions (e)(2) and (e)(4) because the articles reported on judicial proceedings and concerned an issue of public interest. The court further found that Sparks could not demonstrate a probability of prevailing on the merits because his claims were barred by (1) the fair report privilege of Civil Code section 47, subdivision (d), (2) the retraction demand provisions of Civil Code section 48a, and (3) the doctrines of res judicata and collateral estoppel. On August 6, 2013, Sparks filed a notice of appeal.

## DISCUSSION

### I.      Standard Of Review

Section 425.16 is commonly referred to as the anti-SLAPP statute.[3] It provides, in pertinent part, that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) Section 425.16 must be "construed broadly" to effectuate the statute's purpose, which is to encourage participation in matters of public significance and to ensure that such participation is not chilled through an abuse of the judicial process. (§ 425.16, subd. (a).)

Resolution of a section 425.16 special motion to strike requires a two-step process. First, the moving party must make a threshold showing that the challenged cause of action arises from constitutionally protected activity. (*Rusheen v. Cohen* (2006) 37

---

[3]      SLAPP is an acronym for "Strategic Lawsuit Against Public Participation." (*Jarrow Formulas, Inc., v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1.)

5

Cal.4th 1048, 1056; *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.) If the moving party satisfies this prong, the burden shifts to the opposing party to demonstrate a probability of prevailing on the merits of the claim. (*Rusheen v. Cohen*, *supra*, at p. 1056; *Equilon Enterprises v. Consumer Cause, Inc.*, *supra*, at p. 67.) We review a trial court's ruling on a special motion to strike de novo, conducting an independent review of the entire record. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325; *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.)

## II.     Arising From Constitutionally Protected Activity

A cause of action arises from protected activity within the meaning of section 425.16 if the conduct of the defendant on which the cause of action is based was an act in furtherance of the defendant's right of petition or free speech. (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78 ["statutory phrase 'cause of action . . . arising from' means simply that the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech"]; *Navellier v. Sletten* (2002) 29 Cal.4th 82, 89 ["[i]n the anti-SLAPP context, the critical consideration is whether the cause of action is *based on* the defendant's protected free speech or petitioning activity"].) Under section 425.16, an act in furtherance of the right of free speech includes "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law" (§ 425.16, subd. (e)(2)), and "any other conduct in furtherance of the exercise of . . . the constitutional right of free speech in connection with a public issue or an issue of public interest" (§ 425.16, subd. (e)(4)).

Sparks does not dispute that the AP's publication of the challenged articles constituted protected activity under section 425.16. The articles reported on restraining orders issued against Sparks as a result of court proceedings, and thus, concerned "an issue under consideration . . . by a . . . judicial body" within the scope of section 425.16, subdivision (e)(2). (*Traditional Cat Assn., Inc. v. Gilbreath* (2004) 118 Cal.App.4th 392, 397 ["courts have repeatedly held that reports of judicial proceedings . . . are an exercise

6

of free speech within the meaning of section 425.16"]; see also *Braun v. Chronicle Publishing Co.* (1997) 52 Cal.App.4th 1036, 1048-1049.)  Because the restraining orders were sought by Crow and Weinstein, two well-known figures in the entertainment industry, the articles also were published "in connection with . . . an issue of public interest" within the meaning of section 425.16, subdivision (e)(4).  (*Hall v. Time Warner, Inc.* (2007) 153 Cal.App.4th 1337, 1347 ["[a] statement . . . is 'in connection with an issue of public interest' . . . if [it] concerns a topic of widespread public interest and contributes in some manner to a public discussion of the topic"]; see also *Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 807-808.)  The AP therefore met its burden of proving that Sparks's complaint arose from constitutionally protected speech.

### III.    Probability of Prevailing on the Merits

Because the AP made a prima facie showing that the articles fell within the scope of section 425.16, the burden shifted to Sparks to prove a reasonable probability of prevailing on his claims.  To demonstrate a probability of prevailing on the merits of a challenged cause of action, "the plaintiff must 'state[ ] and substantiate[ ] a legally sufficient claim.'  [Citation.]"  (*Jarrow Formulas, Inc. v. LaMarche*, *supra*, 31 Cal.4th at p. 741.)  The plaintiff must make a prima facie showing of facts that would, if proven, support a judgment in his or her favor.  (*Soukup v. Law Offices of Herbert Hafif*, *supra*, 39 Cal.4th at p. 291.)  For purposes of this inquiry, the court ""must accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law."""  (*Flatley v. Mauro*, *supra*, 39 Cal.4th at p. 326.)  Although "'the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.'  [Citation.]"  (*Soukup v. Law Offices of Herbert Hafif*, *supra*, at p. 291.)

Civil Code section 47 provides an absolute privilege for publications made "[b]y a fair and true report in, or a communication to, a public journal, of (A) a judicial, (B)

legislative, or (C) other public official proceeding, or (D) of anything said in the course thereof . . . ." (Civ. Code, § 47, subd. (d)(1); *Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 240.) "The privilege applies if the substance of the publication or broadcast captures the gist or sting of the statements made in the official proceedings." (*Balzaga v. Fox News Network, LLC* (2009) 173 Cal.App.4th 1325, 1337.) A privileged "'news article need not track verbatim the underlying proceeding. Only if the deviation is of such a "substantial character" that it "produce[s] a different effect" on the reader will the privilege be suspended. [Citation.] News articles, in other words, need only convey the substance of the proceedings on which they report, as measured by their impact on the average reader.' [Citation.]" (*Carver v. Bonds* (2005) 135 Cal.App.4th 328, 351-352; see also *Colt v. Freedom Communications, Inc.* (2003) 109 Cal.App.4th 1551, 1558 ["publication concerning legal proceedings is privileged as long as the substance of the proceedings is described accurately"].) "In the context of judicial proceedings, . . . reports which comprise a history of the proceeding come within the privilege, as do statements made outside the courtroom and invoking no function of the court. . . ." (*Braun v. Chronicle Publishing Co.*, *supra*, 52 Cal.App.4th at p. 1050.)

In this case, each of the alleged defamatory statements in the AP's articles was absolutely privileged as a fair and true report of judicial proceedings. The substance of both the July 31, 2012 and August 14, 2012 articles was that restraining orders had been issued against Sparks following court hearings based on threats he had made against Crow and Weinstein. The articles accurately described statements made at the hearings and in the documents filed on behalf of Crow and Weinstein in support of their requests for a restraining order. Indeed, the record reflects that all of the statements in the articles that Sparks claims were defamatory were taken directly from declarations contained in court filings and from testimony given at court hearings. While Sparks asserts that the AP's editorial decisions gave a "false tone" of the events surrounding the hearings and a "false impression" of his mental or emotional state, he did not make any showing that the AP's articles misrepresented what was said during the judicial proceedings.

In support of his claims, Sparks challenges the AP's statement in both the July 31, 2012 and August 14, 2012 articles that a union representative reported that Sparks had threatened to shoot Crow and Weinstein. He also contends that the AP falsely published that he acknowledged making such threat at the August 14, 2012 hearing. The statement in the AP's articles about the threat that Sparks communicated to the Screen Actors Guild employee was based directly on a declaration submitted by the employee in support of Crow's request for a restraining order. In the declaration, the employee stated that, during a telephone conversation with Sparks in which he complained about Crow and Weinstein stealing from him and surreptitiously filming him, Sparks said to her at one point, "I'll just shoot them. Fuck it." At the August 14, 2012 hearing, Sparks did not deny that he had threatened to shoot Crow and Weinstein in his conversation with the union employee. Instead, when questioned about the threat, Sparks testified that the employee's statement about what was said should have included the caveat that Crow and Weinstein were "threatening [his] life."[4] Although the AP did not report Sparks's

---

[4] The transcript of the August 14, 2012 hearing reflects that, when asked whether he told the union employee that he would shoot Crow and Weinstein, Sparks testified as follows: "That was part of a sentence that she edited out. What the thing was, was Sheryl Crow threatened – kept threatening me. Kept threatening – well, I'm – I'm homeless. Driving by at 2:00 in the morning, 'You are going to be killed, Phil.' I'm with SAG because I am a Screen Actors Guild member. And one of the constitutions of being a union member, no one should be harassed or filmed, you know, without his or her permission. I've been to Screen Actors Guild three times. After the first 2007 show, I went to the Screen Actors Guild. I'm a union member. Sheryl Crow and Harvey Weinstein filmed me illegally."

When asked to clarify how his statement was taken out of context, Sparks further testified: "The whole sentence was: 'These people are threatening me, threatening my life.' I have a reason to feel threatened. Because Ronni Chasen was helping me. She was going to turn Sheryl Crow and Steve Weintraub in to the authorities. For one, for embezzlement, and some other stuff. And rape. . . . But I said, 'These people are threatening my life. I'm asking for help. You know, I'm a union member. You are supposed to help me. For one, they are filming me without my permission. Two, I'm homeless in – not Hollywood – Santa Monica and Venice. They are driving by yelling profanity; telling me I'm going to be killed; telling me I should have kept my mouth

9

specific claim that Crow and Weinstein had threatened his life, it did relate that Sparks had stated that he made his threat in frustration because he believed they had stolen from him and continued to follow him. The AP's articles thus accurately conveyed the substance or gist of Sparks's threat.

Sparks also argues that the AP's August 14, 2012 article misrepresented the qualifications of the testifying psychiatrist, Dr. David Glaser, and the circumstances of his meeting with Sparks. In particular, Sparks asserts that the AP should have investigated whether Dr. Glaser had a valid medical license at the time of his testimony, and should have reported that his interview with Sparks was a brief casual conversation, held under false pretenses. However, the statements in the AP's article concerning the basis for Dr. Glaser's opinion about Sparks came directly from his testimony at the August 14, 2012 hearing. Dr. Glaser specifically testified that he was board certified in forensic psychiatry and that he interviewed Sparks for about an hour on August 9, 2012 after approaching him along the Venice Beach Boardwalk. Sparks did not raise any objections to Dr. Glaser's qualifications at the August 14, 2012 hearing, nor did he offer any evidence at that time regarding the status of the doctor's medical license. While Sparks did try to elicit testimony from Dr. Glaser that their meeting lasted only 10 minutes, Dr. Glaser maintained that he spoke with Sparks for almost an hour. The article's references to Dr. Glaser as a forensic psychiatrist who had recently interviewed Sparks was a fair and true report of the doctor's testimony.

Sparks further claims that the AP made defamatory statements in its August 14, 2012 article when it reported that Dr. Glaser had diagnosed him as being "imminently dangerous" and "unambiguously delusional." The record reflects that these statements in the AP's article were based on direct quotes from Dr. Glaser's testimony at the

---

shut.' . . . And I have a reason to be feared for my life because the person that was helping me, Sheryl Crow's publicist, was murdered. She was close to me. So I have a reason. And on that statement I said, 'Listen, if they come near me and they try to hurt me, yes, because you are not helping me, if anybody comes near me and tries to hurt me, I will shoot them.'"

10

August 14, 2012 hearing and were accurately represented by the AP as the doctor's proffered opinion about Sparks. Dr. Glaser specifically testified that Sparks had "directed his psychosis at Ms. Crow," and that his internet postings were "rampant with data that supports that this man is imminently dangerous." Dr. Glaser also testified that Sparks "is unambiguously delusional, and his delusions and his delusional web has pulled Ms. Crow and Mr. Weinstein into it." While Sparks contests the underlying validity of Dr. Glaser's diagnosis and qualifications, he cannot dispute that the AP accurately described what Dr. Glaser said about him at the hearing.

Sparks nevertheless suggests that the AP's article should have portrayed him in a more favorable light by reporting his allegations that he was being "railroaded" by false testimony from witnesses. However, the AP was not required to present Sparks's version of the facts in reporting on the results of the judicial proceedings or to independently investigate whether the witnesses who testified against him were credible. (*Paterno v. Superior Court* (2008) 163 Cal.App.4th 1342, 1355, 1356 ["journalists may simply report the facts of proceedings without providing an explanation of those facts" and "are within their constitutionally protected rights to write an article describing the perspective of only one side of a controversy"]; *Dorsey v. National Enquirer, Inc.* (9th Cir. 1992) 973 F.2d 1431, 1436 [California's fair report privilege "'does not require the reporter to resolve the merits of the charges, nor does it require that he present the [plaintiff's] version of the facts'"].) Because the AP's articles accurately represented the substance of the judicial proceedings and the restraining orders issued against Sparks, they were protected by the fair report privilege of Civil Code section 47, subdivision (d). The trial court accordingly did not err in granting the AP's special motion to strike.[5]

---

[5] In light of our conclusion that Sparks's claims were barred as a matter of law by Civil Code section 47, subdivision (d), we need not consider the trial court's alternative grounds for granting the special motion to strike.

## IV. Notice of the Special Motion to Strike

Sparks also contends that reversal is required because the AP filed its special motion to strike "illegally" by listing the incorrect case number on the notice of motion. This claim lacks merit because Sparks opposed the AP's motion on the merits and failed to demonstrate that he was prejudiced by the alleged defect in the notice.

"A party who appears at the hearing on a motion and contests the motion on the merits without objecting to a defect or irregularity in the notice of motion ordinarily is deemed to waive the defect or irregularity. . . . Courts have applied this rule where the party failed to object at the hearing [citations], where the objection was deemed inadequate [citations], and where the party may have objected but failed to show prejudice resulting from the defective notice [citations]. Courts applying the waiver rule generally have concluded that the party's appearance at the hearing and opposition on the merits showed that the notice 'served its purpose,' despite any defect [citations], and that any defect in the notice did not prejudice the party's preparation for the hearing and opportunity to be heard. [Citations.]" (*Arambula v. Union Carbide Corp.* (2005) 128 Cal.App.4th 333, 342-343.) Consequently, "[i]n order to obtain a reversal based upon such a procedural flaw, the appellant must demonstrate not only that the notice was defective, but that he or she was *prejudiced*. [Citations.] '. . . Procedural defects which do not affect the substantial rights of the parties do not constitute reversible error. [Citation.]'" (*Reedy v. Bussell* (2007) 148 Cal.App.4th 1272, 1288.)

The record reflects that the AP timely filed and served its special motion to strike and that Sparks received the motion. Although the notice of motion originally listed the incorrect case number, the AP corrected the error in a notice of errata that it filed and served on Sparks at least eight days prior to the scheduled hearing. Sparks then filed an opposition to the AP's motion and appeared at the hearing. When Sparks objected that the original notice was defective based on the incorrect case number, the trial court agreed to continue the hearing for an additional month and offered Sparks an opportunity to file a new opposition. Sparks advised the court, however, that the brief he had filed was sufficient to constitute his opposition on the merits, and the court agreed to accept

12

that brief as Sparks's timely filed opposition.  Sparks thereafter attended the continued hearing where he argued the merits of the motion before the trial court.  Under these circumstances, Sparks cannot show that he suffered any prejudice as a result of the caption error in the original notice of motion.  Because the alleged defect was harmless to Sparks, it does not require reversal of the judgment.

## DISPOSITION

The judgment is affirmed.  The AP shall recover its costs on appeal.


ZELON, J.


We concur:


PERLUSS, P. J.


SEGAL, J.*

---

*    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.