[Nos. C053293, C053913. Third Dist. Jan. 11, 2008.]

MARANATHA CORRECTIONS, LLC, et al., Plaintiffs and Appellants, v. DEPARTMENT OF CORRECTIONS AND REHABILITATION et al., Defendants and Respondents.

1078

---

## COUNSEL

Morrison & Foerster, James P. Bennett, George C. Harris and Derek Foran for Plaintiffs and Appellants.

Edmund G. Brown, Jr., Attorney General, James M. Schiavenza, Assistant Attorney General, Alberto L. Gonzalez and Jeffrey R. Vincent, Deputy Attorneys General, for Defendants and Respondents.

OPINION

**BUTZ, J.**—In order for government to function effectively, state officials must have the freedom to make tough policy decisions and tell the public about the reasons behind those decisions, without fear that their statements will expose them to tort liability. For this reason, Civil Code section 47, subdivision (a)[1] cloaks all acts in the proper discharge of an official's duty with an absolute privilege.

In this case, the director of the Department of Corrections[2] published a letter terminating the state's contract with a private prison contractor on the ground, inter alia, that the contractor had "misappropriated" public funds. The contractor, Maranatha Corrections, LLC, along with coplaintiffs the Moreland Family, LLC, and Terry Moreland filed suit against defendants the director, the CDCR, and the State of California, claiming libel and trade disparagement.

The trial court granted defendants' special motion to strike the defamation-based causes of action on grounds that the publication of the letter was protected by the absolute privilege for official acts within the meaning of Civil Code section 47, subdivision (a). The court also awarded defendants attorney fees pursuant to the "anti-SLAPP"[3] statute. (Code Civ. Proc., § 425.16.)

Plaintiffs appeal. They object to the award of attorney fees and assert that the trial court erred, both in finding that the defamation causes of action were protected by the anti-SLAPP statute and in ruling that the director's communications were absolutely privileged. We conclude the trial court got it right on all counts and shall affirm the orders.

---

[1] Civil Code section 47, subdivision (a) provides: "A privileged publication or broadcast is one made: [¶] (a) In the proper discharge of an official duty."

[2] On July 1, 2005, during the events on which this appeal is based, the Department of Corrections was reorganized and renamed the Department of Corrections and Rehabilitation (hereafter CDCR). (Pen. Code, § 5000 et seq.)

[3] SLAPP stands for "strategic lawsuit against public participation" and Code of Civil Procedure section 425.16 is commonly referred to as the "anti-SLAPP" statute (undesignated statutory references are to the Code of Civil Procedure). (See *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 57 [124 Cal.Rptr.2d 507, 52 P.3d 685].) We shall refer to an "anti-SLAPP" motion as a "special motion to strike"—the language used in the statute (§ 425.16, subd. (b)(1)).

## FACTUAL BACKGROUND

### I. The Parties

*The plaintiffs*

Plaintiff Maranatha Corrections, LLC (formerly Maranatha Production Company, LLC, hereafter Maranatha), is a California limited liability company. Terry Moreland is the founder and chief executive officer of Maranatha. The Moreland Family, LLC, is a "single-asset entity" whose only asset is the Victor Valley Modified (Medium) Community Correctional Facility in Adelanto (Victor Valley MCCF).

*The defendants*

The defendants are the State of California, the CDCR and its former director, Jeanne S. Woodford. The CDCR is a statutorily created department within the executive branch of state government. (Pen. Code, former § 5000, as added by Stats. 1944, 3d Ex. Sess., ch. 1, p. 13; *People v. Horton* (1968) 264 Cal.App.2d 192, 196 [70 Cal.Rptr. 186].) At all times relevant, defendant Jeanne Woodford was the Director of Corrections.[4] As such, she was the chief executive officer of the CDCR.

### II. The CDCR-Maranatha Contract

Legislation enacted in 1965 and 1972 authorized the CDCR to contract with either public or private entities to house and supervise inmates at "community correctional centers" or facilities (commonly known as CCF's). (See Pen. Code, §§ 6250–6256.)

On February 1, 1997, the CDCR entered into a long-term contract with Maranatha for the provision of housing, supervision and services for up to 500 correctional inmates at the Victor Valley MCCF.

Title 15, section 3282 of the California Code of Regulations requires all CCF's to provide certain telephone service to correctional inmates, including

---

[4] The Director of Corrections is now known as the Secretary of the Department of Corrections and Rehabilitation. (Pen. Code, § 5050, as amended by Stats. 2005, ch. 10, § 36.)

allowing them to place collect calls to persons outside the facility at designated times. (Cal. Code Regs., tit. 15, § 3282.)

In accordance with this mandate, Maranatha entered into a series of contracts with Global Tel*Link, to provide telephone services to the Victor Valley MCCF. Under the agreements, Maranatha received commissions from the telephone revenue generated by the service.

### III. The Notice of Termination

In 2002, a dispute arose between the CDCR and Maranatha regarding ownership and control over the commissions earned under the Global Tel*Link contracts, income which the parties commonly referred to as "Inmate Telephone Revenue Funds" (ITRF). A June 2002 amendment to the CDCR-Maranatha contract acknowledged these "pending disagreements" and reserved the parties' rights to enforce their respective interpretations of the contract through "legal means including litigation and/or arbitration." Between 1997 and 2004, Maranatha and the Moreland Family, LLC (as Moreland-owned enterprises), received approximately $1.6 million in commissions from the Global Tel*Link contracts.

By letter dated June 29, 2004 (Woodford letter), Director Woodford notified plaintiffs that the CDCR was terminating the Maranatha contract "for cause." The Woodford letter consisted of 14 pages plus attachments, setting forth a detailed explanation of the reasons for the CDCR's termination of the contract. Among the stated grounds was that "Maranatha has misappropriated . . . Inmate Telephone Revenue Funds (ITRF) in an amount estimated to be well in excess of $1 million." According to Woodford, it was the CDCR's position that ITRF constituted "program income," which Maranatha was contractually obligated to remit to the state. Woodford asserted that Maranatha had been either unable or unwilling to account for the ITRF generated at the Victor Valley MCCF and was therefore in material breach of the contract.

The Woodford letter also recited evidence that Terry Moreland had "full control" over all Moreland family entities, leading to the inference that there was "no meaningful distinction" between Maranatha, Moreland Corporation, and the Moreland Family, LLC, for purposes of the contract dispute. If, on the other hand, it turned out these entities were technically distinct, Woodford asserted, "then it appears that these 'separate companies' have engaged in an illegal scheme or conspiracy with Maranatha to misappropriate the ITRF."

In July, August and September 2004, the CDCR provided copies of the Woodford letter to the Victor Valley Daily Press, the Sacramento Bee and

other newspapers; these publications then printed stories about the contents of the letter. CDCR information officer Margot Bach later made statements to the press essentially repeating the assertions contained in the Woodford letter.

In November 2004, the Office of the Inspector General (OIG) issued a report on the results of an inquiry into the dispute between the CDCR and Maranatha over entitlement to ITRF at the Victor Valley MCCF. (OIG Rep. on Review of Inmate Telephone Revenues at the Victor Valley MCCF (Nov. 15, 2004) <http://www.oig.ca.gov/reports/pdf/victorvalleymccf.pdf> [as of Jan. 11, 2008] (OIG Report).) The OIG reported that Maranatha and the Moreland Family, LLC, received $1.6 million in ITRF and refused to recognize the CDCR's right to the income (OIG Rep., at pp. 1–2). The report documented the disagreement between the parties over the contractual rights to ITRF and noted that the parties held "sharply divergent positions" (OIG Rep., at p. 5) on the issue, but ultimately concluded that resolution of the dispute was "beyond the purview of the Office of the Inspector General" (*ibid.*). The report thus declined to evaluate the strength of the parties' respective positions, but recommended that future CDCR contracts contain more specific provisions about entitlement to ITRF (OIG Rep., at pp. 3–6).

## PROCEDURAL HISTORY

Plaintiffs filed the present lawsuit against the state, the CDCR, and former Director Woodford, asserting tort as well as contract-based causes of action. Only the first three causes of action for defamation, disparagement of services and conspiracy to libel are the subject of this appeal.

According to the first amended complaint (FAC), defendants "wrongfully demanded" that Maranatha account for the ITRF generated by the Victor Valley MCCF. When Maranatha continued to assert its lawful right to the ITRF, defendants terminated the contract by issuing the Woodford letter.

Plaintiffs allege that the publication of the Woodford letter was defamatory, in that it contained false accusations of "misappropriation," of "accomplice liability," of perpetuating a "subterfuge against the state" and of engaging in an "illegal conspiracy." The FAC asserts that these statements were "false and libelous per se" in that they charge plaintiffs with "hav[ing] committed crimes of misappropriation and conspiracy." Defendants are alleged to have made these statements for the purpose of "coercing [p]laintiffs to capitulate to [d]efendants' wrongful demands." Further, the statements were uttered with malice, in that they were made "with knowledge of their falsity and/or reckless disregard for their truth."

Defendants' demurrer to the first three causes of action of the FAC was sustained without leave to amend, on the ground that the contents of the Woodford letter were absolutely privileged under Civil Code section 47, subdivision (a).

Defendants then moved to strike the first three causes of action under the SLAPP statute. The court granted the special motion to strike, finding that defendants' communications were protected activity under section 425.16, subdivision (e)(2) (hereafter section 425.16(e)(2)), because they were made in connection with an issue under consideration or review in an official proceeding by an executive body. Since the court previously sustained a demurrer to these causes of action, the court found that plaintiffs were unable to carry their burden of showing a probability that they would prevail on the merits.

Subsequently, the court issued an order granting defendants' motion for attorney fees under section 425.16, subdivision (c).

Plaintiffs appeal from both the order granting the special motion to strike the first three causes of action (C053293)[5] and the order awarding defendants anti-SLAPP attorney fees (C053913). The two appeals have been consolidated.

## DISCUSSION

### I. The Anti-SLAPP Statute and the Standard of Review

▪ "The anti-SLAPP statute is designed to nip SLAPP litigation in the bud by striking offending causes of action[] which 'chill the valid exercise of the constitutional rights of freedom of speech and petition . . . .' (§ 425.16, subd. (a).) Finding a 'disturbing increase' in such lawsuits, the Legislature has declared it in the public interest 'to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process.' (*Ibid.*) [¶] Thus, where a cause of action arises 'from any act' of a person 'in furtherance of the person's right of petition or free speech . . . in connection with a public issue,' that cause is subject to a motion to strike, unless the plaintiff establishes a probability of prevailing on the claim. (§ 425.16, subd. (b).)" (*Braun v. Chronicle Publishing Co.* (1997) 52 Cal.App.4th 1036, 1042 [61 Cal.Rptr.2d 58] (*Braun*).) In order to "encourage continued participation in matters of public significance," the Legislature has mandated that section 425.16 "shall be construed broadly." (§ 425.16, subd. (a).)

---

[5] The notice of appeal from the order granting defendants' special motion to strike (C053293) also purports to appeal from a prior order sustaining the demurrer without leave to amend. That order is nonappealable (*Olson v. Volkswagen of America* (1988) 201 Cal.App.3d 1437, 1439 [247 Cal.Rptr. 719]) and the purported appeal from it is dismissed.

In determining whether to grant a special motion to strike an alleged SLAPP, the trial court engages in a two-step process. First, the court determines whether the challenged cause of action arises from a protected activity as described in the statute. (§ 425.16, subd. (e).) Second, if the court so finds, it then decides whether the plaintiff has established a probability of prevailing on the merits of the claim. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 [124 Cal.Rptr.2d 530, 52 P.3d 703].)

An order granting a special motion to strike is an appealable order. (§ 425.16, subd. (i); *Vergos v. McNeal* (2007) 146 Cal.App.4th 1387, 1394 [53 Cal.Rptr.3d 647].) We review de novo a ruling on a special motion to strike under section 425.16. (*Kyle v. Carmon* (1999) 71 Cal.App.4th 901, 907 [84 Cal.Rptr.2d 303].) Thus, we apply our independent judgment, both to the issue of whether the cause of action arises from a protected activity and whether the plaintiff has shown a probability of prevailing on the claim. (*Tutor-Saliba Corp. v. Herrera* (2006) 136 Cal.App.4th 604, 609–610 [39 Cal.Rptr.3d 21] (*Tutor-Saliba*).)

This case arises in an unusual procedural context, in that the trial court sustained a demurrer without leave to amend to the defamation-related causes of action *before* granting defendants' special motion to strike them. Although the order sustaining the demurrer is reviewable as an intermediate order affecting the rights of the parties (§ 906), we do not pause to reach the merits of the demurrer. The reason is simple: The special motion to strike contains a developed factual record not available to us on demurrer. Furthermore, if the motion to strike was properly granted, any error in sustaining the demurrer would surely be harmless.

## II. Protected Activity Under Section 425.16

The initial question is whether the first three causes of action embraced activity protected by the anti-SLAPP statute. Section 425.16, subdivision (e) provides that a cause of action is subject to a special motion to strike if it arises from acts " 'in furtherance of a person's right of petition or free speech . . . in connection with a public issue.' " Subdivision (e) defines such issues as *including* "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) *any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law*; (3) *any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest* . . . ." (Italics added.)

The trial court found that the defamation-related causes of action, all of which were predicated on the dissemination of the Woodford letter to the press, fell within section 425.16(e)(2).

We shall conclude these claims qualify for SLAPP treatment under section 425.16(e)(2) and (3).

### A. Section 425.16(e)(2)

■ During the period identified in the FAC, Woodford was the department head of the CDCR, part of the executive branch of state government. As used in section 425.16(e)(2), a matter is "under consideration" if it "is one kept 'before the mind', given 'attentive thought, reflection, meditation.' [Citation.] A matter under review is one subject to 'an inspection, examination.' " (*Braun, supra*, 52 Cal.App.4th at p. 1049.)

Maranatha's right to retain revenue from inmate telephone calls at the Victor Valley MCCF was undoubtedly an "issue under consideration" by Woodford and the CDCR. Indeed, the CDCR and Maranatha argued over the issue for years and their disagreement was referenced in an amendment to the contract. The conflict finally came to a head when Woodford terminated the contract on the ground that Maranatha had failed to account for and wrongfully withheld the ITRF.

Plaintiffs' claim that courts have found that a matter was under consideration or review "only in cases involving formal proceedings specifically authorized by statute" is inaccurate. Neither of the cases cited (*Annette F. v. Sharon S.* (2004) 119 Cal.App.4th 1146 [15 Cal.Rptr.3d 100] (*Annette F.*); *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993 [113 Cal.Rptr.2d 625]) states or implies that statements relating to issues under consideration by a governmental body fail to qualify for anti-SLAPP protection unless they are *also* the subject of "official proceedings."

■ The assertion that "official proceedings" are a necessary prerequisite to public interest protection also disregards the plain language of section 425.16(e)(2), which protects "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, *or* any other official proceeding authorized by law." (§ 425.16(e)(2), italics added.) The statement thus enjoys protected status if it is connected either to an issue under review by one of the three branches of government *or* to an official proceeding authorized by law. Plaintiffs would change the "or" to an "and" in derogation of settled principles of statutory construction and in disregard of the legislative mandate that section 425.16 be construed "broadly."

### B. Section 425.16, subdivision (e)(3)

The defamation causes of action based on public disclosure of the Woodford letter were also subject to a special motion to strike because the letter qualifies as a "written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." (§ 425.16, subd. (e)(3).)

"Under its plain meaning, a public forum is not limited to a physical setting, but also includes other forms of public communication." (*Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 476 [102 Cal.Rptr.2d 205].) A local newspaper that is a vehicle for public discussion constitutes a forum for public communication. (*Annette F., supra*, 119 Cal.App.4th at p. 1161.)

Director Woodford's assertions of misappropriation were connected to an issue of public interest. Maranatha received a lucrative contract with the state to operate a correctional facility. The Woodford letter terminated that contract based, in substantial part, on the improper withholding of monies rightfully belonging to the state. The Legislature has made clear that the government's business is the people's business and that California's citizens have a right to full disclosure of all information which affects the public fisc. (See Gov. Code, § 6250 ["access to information concerning the conduct of the people's business is a fundamental and necessary right of every person in this state . . ."].) Thus, it cannot be doubted that the assertion by a state agency that a private contractor wrongfully withheld $1.6 million in taxpayer funds is a matter of concern and interest to the public.

For all of the above reasons, we conclude that the first three causes of action fell within the protection of section 425.16 and were properly the subject of a special motion to strike.

### III. Probability of Prevailing on the Merits

The second half of our inquiry is to decide whether plaintiffs showed a probability that they will prevail on their defamation-related claims.

The trial court found that plaintiffs could not prevail, because the release of the Woodford letter was protected by the absolute privilege for acts in the proper discharge of an official duty. (Civ. Code, § 47, subd. (a).) We agree.

█ We initially observe that, although the state and the CDCR are named defendants, a public entity is not liable for any claim except as provided by statute or required by the state or federal Constitutions. (Gov. Code, § 815;

*Lundeen Coatings Corp. v. Department of Water & Power* (1991) 232 Cal.App.3d 816, 832 [283 Cal.Rptr. 551].) A public entity may be liable for injury caused by acts or omissions of its employees in the course and scope of employment. (Gov. Code, § 815.2.) Thus, the state and the CDCR can be held vicariously liable only if plaintiffs can prevail against former Director Woodford.

██ Enacted in 1872, Civil Code section 47, subdivision (a) "confers privileged status upon any statement made by a public official in the course of discharging his [or her] official duties." (*Royer v. Steinberg* (1979) 90 Cal.App.3d 490, 500 [153 Cal.Rptr. 499] (*Royer*).) As the court summarized in *Royer*: "[T]he policy of protecting the free exercise of governmental decision-making mandates that the privilege of [Civil Code] section 47, subdivision 1 [(now subd. (a))] must be granted not only to 'high-level' state executive officers, but also to all state and local officials who engage in the policy-making process. We therefore hold that the privilege . . . protects any statement by a public official, so long as it is made (a) while exercising policy-making functions, and (b) within the scope of his [or her] official duties." (*Royer*, at p. 501, citation omitted.)

Cases applying the doctrine are legion. We mention a few. In *Barr v. Matteo* (1959) 360 U.S. 564 [3 L.Ed.2d 1434, 79 S.Ct. 1335], a scandal developed in the office of a federal agency concerning employees who had been permitted to take their accumulated terminal-leave payments and then be rehired as temporary employees. (*Id.* at pp. 565–566 [3 L.Ed.2d at p. 1438].) The affair received widespread publicity, prompting the acting director of the agency to suspend two of his subordinates and issue a press release implying that they were responsible for the misdeeds. (*Id.* at p. 567 [3 L.Ed.2d at p. 1439].) In a suit for libel by the two officials, the United States Supreme Court held that the director's statements were absolutely privileged. Noting that the director headed "an important agency of government" and that the agency's integrity had been "severely challenged . . . and given wide publicity" (*id.* at p. 574 [3 L.Ed.2d at p. 1443]), the court held that his response "was an appropriate exercise of the discretion which an officer of that rank must possess if the public service is to function effectively" (*id.* at p. 575 [3 L.Ed.2d at p. 1443]). Thus, the policy of protecting officials from lawsuits that "might appreciably inhibit the fearless, vigorous, and effective administration of [governmental] policies" took precedence (*id.* at p. 571 [3 L.Ed.2d at p. 1441]; see also *id.* at p. 576 [3 L.Ed.2d at p. 1444]).

In *Saroyan v. Burkett* (1962) 57 Cal.2d 706 [21 Cal.Rptr. 557, 371 P.2d 293] (*Saroyan*), our Supreme Court followed the precedent of its federal counterpart to bar a defamation suit against the state superintendent of banks by an employee who alleged he was defamed by the superintendent's *statements to*

*the press* relating to the employee's conduct as attorney for the state banking department. The *Saroyan* court declared: "The Superintendent of Banks is the head of the State Banking Department, appointed by the Governor and holding office at his pleasure; he is a member of both the Board of Investment and the Governor's Council. (Fin. Code, §§ 210, 211.) Defendant was acting in the exercise of an executive function when he defended the policy of his department, and his statements were related to the defense of that policy. Accordingly defendant was protected by an absolute privilege." (*Saroyan*, at pp. 710–711.)

In *Kilgore v. Younger* (1982) 30 Cal.3d 770 [180 Cal.Rptr. 657, 640 P.2d 793] (*Kilgore*), the state Attorney General called a press conference in which he released a report suggesting the plaintiff was involved in an illegal bookmaking operation. (*Id.* at pp. 774–778.) Even though the allegedly libelous assertions were made to the press, the California Supreme Court held they were absolutely privileged as within the "proper scope" of the Attorney General's official duties. (*Id.* at p. 782.)

In *Royer*, members of the board of trustees of a school district passed a motion that was published in the official school district newspaper, accusing a former school superintendent of preparing and distributing forged election materials. (*Royer*, *supra*, 90 Cal.App.3d at pp. 496–497.) The Court of Appeal held these acts were absolutely privileged as communications made in the discharge of an official duty. (*Id.* at p. 501; see also *Morrow v. Los Angeles Unified School Dist.* (2007) 149 Cal.App.4th 1424, 1440–1443 [57 Cal.Rptr.3d 885] (*Morrow*) [official duty privilege protected school district officials who published statement announcing the replacement of plaintiff high school principal and implying he was responsible for outbreaks of violence on campus].)

Director Woodford, as the chief executive officer of the CDCR, a statutorily created department of the executive branch, was a policymaking public official. She was appointed by the Governor and confirmed by the state Senate. In her declaration, Woodford stated that her decision to terminate Maranatha's contract was made "as the executive head of a Department of the State under the powers and authorities conferred on the Office to which I was duly appointed." Plaintiffs produced no evidence to contradict that statement.

■ Like the government officials in *Barr*, *Saroyan* and *Kilgore*, Woodford released the termination letter to the press in defense of a policy decision she made. (*Saroyan*, *supra*, 57 Cal.2d at pp. 710–711.) As Director of Corrections, Woodford had a "duty to communicate with the press about matters of public concern." (*Morrow*, *supra*, 149 Cal.App.4th at p. 1431.)

"Because a public official's duty includes the duty to keep the public informed of his or her management of the public business, press releases, press conferences and other public statements by such officials are covered by the 'official duty' privilege, although similar statements by private litigants are not covered by the litigation privilege." (*Rothman v. Jackson* (1996) 49 Cal.App.4th 1134, 1149, fn. 6 [57 Cal.Rptr.2d 284], citing *Kilgore, supra*, 30 Cal.3d at pp. 779–780.)

Plaintiffs attempt to avert the tidal wave of authority against them by disregarding Woodford's role as author of the letter and claiming that CDCR employee Margot Bach was not exercising policymaking functions when she released the Woodford letter and answered questions from the press.

This is a bogus argument. Bach is not a party defendant. The FAC asserts no cause of action against her. Instead, plaintiffs allege that "*through CDCR spokespeople, including Margot Bach*," Woodford, the CDCR and the state "published" their defamatory allegations of misappropriation. (Italics added.) The gravamen of the complaint is thus the *publication* by Woodford and the CDCR of the contents of the termination letter. Bach's news conference was simply one of the *means* by which defendants disseminated the alleged defamatory statements.

Plaintiffs repeatedly cite *Sanborn v. Chronicle Pub. Co.* (1976) 18 Cal.3d 406 [134 Cal.Rptr. 402, 556 P.2d 764], which is inapposite. In *Sanborn*, a county clerk made statements to a local newspaper, asserting that the plaintiff attorney had done a " 'real con job' " on him in persuading him to release attached funds improperly. (*Id.* at p. 410.) The California Supreme Court upheld a jury verdict for defamation, concluding that the clerk was not carrying out policymaking functions when he made the statements. (*Id.* at p. 413.) Likewise, in *Neary v. Regents of University of California* (1986) 185 Cal.App.3d 1136 [230 Cal.Rptr. 281], the appellate court reversed a summary judgment because it was unclear (and therefore a triable issue of fact) whether a university vice chancellor was acting in a policymaking capacity when he released an internally generated confidential report that allegedly defamed the plaintiff. (*Id.* at pp. 1141–1143.)

Here, by contrast, Woodford's disclosure of the letter was in the course and scope of her decision to *terminate a contract*, based upon $1.6 million in revenue that she believed plaintiffs had wrongfully withheld from the state. The Woodford letter itself demonstrates that the allegedly defamatory assertions were the result of careful consideration of an important issue by a policymaking agency head of state government. Such an exercise of discretionary function is precisely the kind of activity that Civil Code section 47, subdivision (a) was designed to shelter from civil lawsuits. (See *Kilgore,*

*supra*, 30 Cal.3d at pp. 781–782, citing *Barr v. Matteo*, *supra*, 360 U.S. at p. 571 [73 L.Ed.2d at p. 1441].)

Plaintiffs contend that the Woodford letter was not the "proper" exercise of an official duty because it contained allegations not only against Maranatha, but against Terry Moreland and the Moreland Family corporation, who were nonsignatories to the Victor Valley MCCF contract.

However, the Woodford letter is addressed to all three plaintiffs for good reason: It sets forth a detailed explanation, with supporting evidence, which led to Director Woodford's conclusion that Terry Moreland exerted "full control over the Moreland financial empire and its entire family of close corporations," and that, for purposes of the contract dispute, "there is no meaningful distinction between Maranatha, Moreland Corporation, and the Moreland Family, LLC, *since they are all merely extensions of* [*Terry Moreland*]." (Italics added.) Her opinion was corroborated by Moreland's description, in deposition testimony, of the interlocking relationship among the entities, as well as his admission that he reported the ITRF as income on the tax returns of both Maranatha and the Moreland Family, LLC. Accordingly, Woodford's discretionary act of addressing the letter to Maranatha, the Moreland Family, LLC, and Terry Moreland personally, fell within the scope of her official duties.

Plaintiffs also argue that, unlike the Attorney General in *Kilgore*, the director of the "CDCR has no 'official duty' to investigate" and prosecute criminal conduct, and therefore had no privilege to accuse them of the criminal act of "misappropriation."

█ The argument does not impress us for two reasons: First, it strips out the word "misappropriation" from the context in which it appears. According to Merriam-Webster's Dictionary of Law, to "misappropriate" means "to appropriate *wrongfully or* unlawfully (as by theft or embezzlement)." (Merriam-Webster's Dict. of Law (1996) <http://dictionary.reference.com/browse/misappropriate> [as of Jan. 11, 2008], italics added.)

The Woodford letter is written in the context of a *contract dispute*. A fair reading makes clear that in terminating the contract on grounds of "misappropriation," Woodford was using the word in the first sense of the word, i.e., that Maranatha *wrongfully* appropriated funds that belonged to the CDCR, thereby breaching the Victor Valley MCCF agreement. We therefore disagree

with plaintiffs that, by using the word "misappropriation," Woodford was necessarily accusing Maranatha of committing a crime.

■ Second, even if plaintiffs' imaginative gloss could be placed on the term "misappropriation," publication of the Woodford letter would still be absolutely privileged. A decision to terminate a contract on account of criminal conduct is as equally an important function of the head of a state agency as contract termination for more mundane transgressions. Communications made in the course of an official duty do not lose their privileged status simply by virtue of the egregiousness of the conduct they target. (See *Tutor-Saliba, supra,* 136 Cal.App.4th at pp. 611–615 [city attorney's luncheon speech accusing the plaintiff of " 'cheat[ing] legitimate minority contractors of their fair share of work,' " and a " 'pattern of fraud and false claims,' " absolutely privileged as within the scope of his official duty; special motion to strike defamation suit properly granted].)

■ We conclude that public dissemination of Woodford's alleged defamatory statements was protected by the official acts privilege of Civil Code section 47, subdivision (a). Plaintiffs failed to show a probability of prevailing on the merits and thus the trial court properly granted defendants' special motion to strike. (*Morrow, supra,* 149 Cal.App.4th at p. 1443.)

Our disposition makes it unnecessary to reach the defendants' alternative arguments for affirming the order, e.g., that the causes of action were barred by the truth defense, other privileges, or the statutory immunity afforded to discretionary acts by government employees.[6]

## IV. Attorney Fees

Plaintiffs' appeal of the order awarding attorney fees (C053913) is based solely on the merits of the appeal from the order granting the special motion to strike (C053293). Maranatha does not claim the amount of the fee award was excessive. Because we find no error in the order striking the defamation-related claims under the anti-SLAPP statute, the award of attorney fees must be affirmed as well. (§ 425.16, subd. (c).)

■ Defendants are also entitled to an award of attorney fees on appeal. (§ 425.16, subd. (c); *Community Facilities Dist. v. Harvill* (1999) 74 Cal.App.4th 876, 883 [88 Cal.Rptr.2d 405] ["Statutory authorization for recovering attorney fees in the trial court necessarily includes attorney fees incurred on appeal unless the statute specifically provides otherwise."].)

---

[6] Since our decision does not depend on any evidence extraneous to the record below, we dismiss defendants' motion for judicial notice of such documents and materials as moot.

## DISPOSITION

The orders appealed from are affirmed. Defendants shall recover costs. (Cal. Rules of Court, rule 8.278(a)(1).) The matter is remanded to the trial court to determine the proper amount of attorney fees to be awarded defendants on appeal.

Scotland, P. J., and Cantil-Sakauye, J., concurred.