Filed 12/4/13  Corzac v. City and County of San Francisco CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CORZAC, INC. et al.,<br><br>      Plaintiffs and Appellants,<br><br>v.<br><br>THE CITY AND COUNTY OF SAN FRANCISCO et al.,<br><br>      Defendants and Respondents. | A135767<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-10-505813) |

**I.**

**INTRODUCTION**

Clarice Lacau and Ricci Cornell owned a restaurant and live entertainment venue located on property leased from the City and County of San Francisco (City), acting through the San Francisco Port Commission (Port).  The City terminated the lease following two fatal shootings outside their establishment.  Media coverage included statements from Port officials regarding the termination of the lease.  Port officials stated that, among other grounds for terminating the lease, the business was not operating within the terms of the lease.  Lacau, Cornell, and their business sued the City, the Port, and certain Port officials (respondents).  This appeal concerns only a cause of action for defamation, which was premised on the allegedly false statements regarding the failure to comply with the lease.

Respondents moved in the trial court to strike the defamation cause of action pursuant to California's anti-SLAPP statute (Code Civ. Proc., § 425.16).[1] The trial court granted the motion, finding (a) respondents' statements regarding the termination of the lease arose from protected activity, and (b) plaintiffs had failed to show they could prevail on their defamation claim. We agree with the trial court, and affirm.

## II.

## FACTUAL AND PROCEDURAL BACKGROUNDS

Lacau and Cornell leased a building located at Pier 50 on San Francisco's waterfront beginning in 1994. From this location they ran a business called Jelly's, a Dance Café (Jelly's). Although the lease provided the premises "shall be used for a Restaurant and Bar and for no other purposes," Jelly's provided musical entertainment from its inception, according to Cornell. This included salsa dancing and other dancing events. Cornell believed Port officials were aware that Jelly's provided dancing and musical entertainment, and that they had no objections. Jelly's also had licenses from other City departments, including the San Francisco Entertainment Commission (Entertainment Commission).

The live music and salsa dancing at Jelly's was popular. Unfortunately, there were three shootings, two fatal, outside of the establishment following events at Jelly's. Following the second fatal shooting on July 12, 2010, the Entertainment Commission suspended the establishment's operating license for seven days. Following the suspension, the owners of Jelly's met with the police to develop a plan that would satisfy the police and the Entertainment Commission that Jelly's could safely resume operations. On July 19, 2010, however, the Port, acting through Susan Reynolds, the deputy director of its real estate department, issued a 30-day notice of termination of the lease. At the time, the tenancy was month to month.

---

[1] SLAPP is an acronym for "strategic lawsuit against public participation." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 57.) All further statutory references are to the Code of Civil Procedure unless otherwise noted.

The July 2010 fatal shooting was reported in the San Francisco media. Given that it was not the first shooting connected to Jelly's, and there had been other recent shootings linked to nightclubs in the City, the media followed up on the story. There were reports not only about the shooting, but also about the suspension of the business's entertainment license and the subsequent lease termination. One news account described the shooting as "The killing that shoved Jelly's into the limelight . . . ."

A July 20, 2010 story published in the San Francisco Examiner newspaper reported the termination of the lease ("Port of SF boots Jelly's club after fatal shooting"). The story included a quote from Port spokeswoman Renee Dunn Martin: "We just felt that it's in the best interest of the Port, and the best interests of the public, that we not continue their lease." Martin continued: "It's really more about concern about public safety, from the Port's perspective." According to the story, Martin also commented that the police had been called to Jelly's numerous times over the years, and that the lease permitted a full-service restaurant, not a nightclub.

Patrons of Jelly's came forward to support the establishment. A July 28, 2010 story in the Bay City News reported on plans by supporters of Jelly's to attend an Entertainment Commission meeting ("Jelly's Supporters Protest Closing of Club Following Shooting"). Once again the story included remarks from Martin, who indicated the shooting was the main reason for the eviction. Martin also pointed to noise complaints and to the Port's view that Jelly's was operating outside its lease as a dance club when the lease provided for a full-service restaurant. The story quoted Martin as saying, "It might be the public's perspective that this is a great club and many people enjoy going there, and I can understand that, but at the same time we have a contract agreement with the leaseholders there . . . . [¶] When they go outside of their contract agreement, that gives us the right to exercise contract termination if we feel that's necessary, which we obviously did." Martin denied a claim by Jelly's supporters that the Port was evicting Jelly's in order to reclaim valuable waterfront property for redevelopment.

3

A press release dated August 9, 2010, and signed by Lacau and Cornell, announced a "Protest Rumba" that was to take place in front of the Port offices on August 13. The release stated that Jelly's was being evicted after complaining about the Port's sewage system. The release suggested the stated reasons for the eviction—the shooting and lease violations—were a pretext for the eviction. Members of the community were encouraged to support Jelly's by attending the protest, and by signing an online petition to save Jelly's.

Eventually, Lacau, Cornell, Jelly's, and a corporate operating entity, CorZac, Inc., sued over the eviction of Jelly's. In a first amended complaint for damages and injunctive relief (FAC), they accused the City, the Port and others of breaching the lease, and retaliating against Jelly's for complaining about the Port's sewage system. Plaintiffs alleged: "Since June of 2010, Jelly's has repeatedly told [respondents] that the Port's sewage system around Jelly's is not functioning properly and causing serious, ongoing damage to both Jelly's and the environmental health of the San Francisco Bay.

The complaint included a cause of action for defamation against respondents alleging they made false statements about plaintiffs to the media that were published for "public consumption." The general factual allegations of the FAC attributed the defamatory statements to Martin and Reynolds. The complaint declared: "By falsely alleging that Jelly's had engaged in illegitimate and unauthorized operations, the Port damaged the reputations of Jelly's and its owners."

Respondents filed a special motion to strike the defamation cause of action pursuant to section 425.16. They contended that statements by Martin and Reynolds were protected activity under the anti-SLAPP statute, and that plaintiffs could not demonstrate a probability of success on the merits of their defamation claim. Respondents argued that plaintiffs could not prevail on the merits because the statements were true, privileged, and made without the actual malice necessary to establish a cause of action for defamation under the circumstances of the case.

Respondents submitted declarations from Martin and Reynolds in support of their motion. Martin described her duties as the "Manager of Communication for the Port of

4

San Francisco," which included serving as media spokesperson for the Port. Martin explained that following the issuance of the 30-day notice to terminate the lease, she spoke to Reynolds about the matter. Reynolds told Martin the lease was being terminated primarily based on public safety concerns arising from the shootings. Reynolds also stated that Jelly's was operating outside of its lease. When the media contacted Martin for the Port's response to plaintiffs' claim the eviction was improper, Martin relayed Reynolds's statement of reasons for the eviction.

Reynolds declared that she was responsible for managing over 500 commercial tenants, and for supervising the work of the Port's real estate department staff. She reported to the Port's executive director as well as to the Port itself. She was vested with the authority to, and did, issue the 30-day notice to terminate the Jelly's lease. She also communicated with the media from time to time on Port leasing issues. She recalled being contacted by the San Francisco Chronicle newspaper regarding a story it was preparing about the termination of the lease. She told the reporter Jelly's was being evicted for public safety reasons related to the shootings outside the establishment. She denied the lease was being terminated in retaliation for complaints about the Port's sewage system.

Plaintiffs implicitly conceded that the Port officials' statements were protected activity by offering no argument on the point in their opposition to the motion to strike. Instead, they focused on demonstrating that their defamation cause of action had merit. They also asked for the opportunity to depose Martin. Plaintiffs supported their opposition with a declaration from Cornell, who described Jelly's business and the apparent acquiescence by Port officials in how the business was conducted. Plaintiffs also submitted transcript excerpts from a deposition Martin gave in an unlawful detainer action the City filed against them, along with copies of the San Francisco Examiner and Bay City News articles that contained Martin's statements.

The trial court granted the motion to strike. The court concluded the defamation cause of action arose from protected activity, and that plaintiffs had failed to show the claim had the requisite minimal merit. With respect to the merits, the court found any

statement by Reynolds was privileged under Civil Code section 47, subdivision (a) (privileged publication in the proper discharge of an official duty). With respect to statements made by Martin, the court found that plaintiffs were limited public figures, and that they had failed to show Martin had acted with reckless indifference. The court denied plaintiffs' request to depose Martin on the ground any additional information elicited from Martin would not change the court's analysis. The court also denied plaintiffs' request, made at the hearing on the motion to strike, to depose Reynolds for failure to make the request in the opposition papers. CorZac, Inc. and Jelly's appealed from the court's order.[2]

## III.

## DISCUSSION

### A. The Applicable Legal Principles

"A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)

Our Supreme Court has succinctly summarized the two steps involved in applying the anti-SLAPP statute: " 'First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one "arising from" protected activity. (§ 425.16, subd. (b)(1).) If the court finds such a showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on

---

[2] "Plaintiffs' Notice of Appeal" states CorZac, Inc. and Jelly's appeal from the order granting the special motion to strike. There is no explanation in the record or the briefs as to why Lacau and Cornell did not join in the appeal. Further, the record is not clear as to whether Jelly's is a separate entity or simply a "dba" (doing business as) for CorZac, Inc., or Lacau and Cornell. In any case, from this point forward we will use the term "appellants" in order to reflect the fact that not all of the plaintiffs are parties to this appeal.

6

the claim.' [Citation.]" (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 819-820 [*Oasis West*].) Only a cause of action that arises from protected speech or petitioning and lacks even minimal merit is subject to being stricken under the anti-SLAPP statute. (*Id.* at p. 820.)

We review an order granting or denying an anti-SLAPP motion to strike de novo. (*Oasis West*, *supra*, 51 Cal.4th at p. 820.) "In considering the pleadings and supporting and opposing declarations, we do not make credibility determinations or compare the weight of the evidence. Instead, we accept the opposing party's evidence as true and evaluate the moving party's evidence only to determine if it has defeated the opposing party's evidence as a matter of law. [Citation.]" (*Albanese v. Menounos* (2013) 218 Cal.App.4th 923, 928-929.)

## B. The First Prong—Protected Activity

For the first time on appeal, appellants argue the Port officials' statements did not arise from protected activity. In their opening brief, however, they offer only half of an argument—they discuss only one of the two grounds respondents urged below for finding protected activity. Although appellants expand their discussion to encompass both grounds in their reply brief, we treat the first prong of the anti-SLAPP analysis as having been established by waiver under these circumstances. (See *DiCola v. White Brothers Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 676 [appellate court not obliged to consider arguments not advanced in the trial court].) Even if not waived, we would conclude that respondents carried their initial burden of demonstrating that Martin's and Reynolds's statements arose from an "act in furtherance of the person's right of petition or free speech . . . in connection with a public issue." (§ 425.16, subd. (b)(1).)

Among the exemplars of protected speech set forth in the anti-SLAPP statute are statements "made in a place open to the public or a public forum in connection with an

7

issue of public interest." (§ 425.16, subd. (e)(3).)[3] Here, the statements were reported in the media (see *Nygard, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1038 [newspaper is a public forum]) in connection with at least three issues of public concern and importance: (1) criminal acts on Port property, (2) the leasing and use of Port property, and (3) the alleged neglect of the Port sewage system. Appellants' claim that there was no public interest in the parties' mere contractual dispute frames the issue too narrowly, and is refuted by their own pleadings. (See *Maranatha Corrections, LLC v. Department of Corrections & Rehabilitation* (2008) 158 Cal.App.4th 1075, 1086 [state official's assertion that private contractor had wrongfully withheld taxpayer funds is a matter of concern and interest to the public] (*Maranatha*).)

Therefore, both on grounds of waiver as well as on the merits, we conclude that the defamation cause of action fell within the protection of the anti-SLAPP statute.

### C. The Second Prong—The Probability of Prevailing on the Claim

#### 1. The Burden of Proof

Having determined that the Port officials' statements arose from protected activity, the burden shifts to appellants to demonstrate their complaint is both legally sufficient and supported by a prima facie showing of facts to sustain a favorable judgment. (*Oasis West*, *supra*, 51 Cal.4th at p. 820.) Appellants, however, point out that the trial court found they could not prevail on their defamation claim based on affirmative defenses asserted by respondents. They therefore rely on authority for the proposition that the burden remained with respondents to prove their defenses. (See *Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2006) 136 Cal.App.4th 464, 477 [defendant advancing affirmative defense in special motion to strike bears burden of proof on the defense].)

---

[3] Arguably the statements were also "made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law." (§ 425.16, subd. (e)(2).) It is not necessary, however, to decide that issue.

8

There is counter authority that suggests the burden of proof remains with the plaintiff on the second prong, even when the defendant relies on an affirmative defense. (*Birkner v. Lam* (2007) 156 Cal.App.4th 275, 285.)  The plaintiff meets that burden by showing the defense is not applicable as a matter of law, or by a prima facie showing of facts which, if accepted by the trier of fact, would negate the defense.  (*Ibid.*; see *No Doubt v. Activision Publishing, Inc.* (2011) 192 Cal.App.4th 1018, 1029, fn. 4.)

Regardless of where the burden lies in this case, we are satisfied that respondents introduced sufficient, uncontradicted evidence to establish their affirmative defenses.

## 2.  *The Official Duty Privilege*

The trial court found the statements made by Reynolds were privileged under Civil Code section 47, subdivision (a), which protects statements made "[i]n the proper discharge of an official duty."  (*Ibid.*)  Sometimes called the executive officer privilege (*Morrow v. Los Angeles Unified School Dist.* (2007) 149 Cal.App.4th 1424, 1440) or the official duty privilege (*Rothman v. Jackson* (1996) 49 Cal.App.4th 1134, 1149, fn. 6), the privilege applies "to all state and local officials who engage in the policy-making process."  (*Royer v. Steinberg* (1979) 90 Cal.App.3d 490, 501.)  The privilege is absolute and it "protects any statement by a public official, so long as it is made (a) while exercising policy-making functions, and (b) within the scope of his official duties."  (*Ibid.*)

Reynolds managed the commercial leases of the Port.  She was vested with the authority and discretion to terminate the Jelly's lease, without consulting with the Port. After the July 2010 shooting, she decided to terminate the lease for public safety reasons. She relayed that reason to Martin, the Port spokesperson, along with a secondary reason: Jelly's was "operating outside its lease as a late-night dance club."

Reynolds's decision to terminate the lease was no mere ministerial act, as argued by appellants.  It was a discretionary, policy-making decision made based on the particular circumstances, including violence on Port property.  Reynolds's duties also included communicating with the media regarding Port leasing issues, and Jelly's

9

compliance with the Port's lease. The official duty privilege protected her statements, regardless of whether she was right or wrong about Jelly's complying with its lease.

In support of their ministerial act argument, appellants rely on *Sanborn v. Chronicle Pub. Co.* (1976) 18 Cal.3d 406 (*Sanborn*). They argue the case is "on all fours with the instant case." We disagree.

The defendant in *Sanborn* was a county clerk who mistakenly released funds that had been deposited with the clerk's office. When a newspaper reporter contacted the defendant about the incident, defendant said the plaintiff had "outtalked" him and that it "was a real con job." (*Sanborn*, *supra*, 18 Cal.3d at p. 410.) The Supreme Court held the official duty privilege did not protect the defendant because he was not exercising policy-making functions when he defamed the plaintiff. (*Id.* at p. 413.) The Supreme Court observed that a government official's discussions with the press regarding the functioning of his or her office would seem to fall within the category of routine, ministerial duties. (*Id.* at p. 415.)

*Sanborn* is inapposite. Reynolds was not merely discussing with the media how her office functioned. She was relaying the reasons for her discretionary decision to terminate a Port lease. There was nothing routine or ministerial about the decision.

As respondents suggest, a more relevant case is *Maranatha*, *supra*, 158 Cal.App.4th 1075. That case involved a former director of the state Department of Corrections and Rehabilitation, who had terminated a contract between the state and a private contractor. The director conveyed her decision to the plaintiffs in a letter that stated the reasons for her decision. Among those reasons was the director's belief that the plaintiffs had misappropriated over $1 million. (*Id.* at p. 1081.) The letter was later released to the public. The plaintiffs claimed the letter defamed them. The *Maranatha* court, however, found the official duty privilege protected the director's statements in the letter. (*Id.* at p. 1091.) The court rejected comparisons to *Sanborn*, *supra*, 18 Cal.3d 406, and noted the letter demonstrated careful consideration of an important issue by a policymaking state official. (*Maranatha*, *supra*, 158 Cal.App.4th at p. 1089.)

10

Public officials have a general duty to keep the public informed about public business.  (*Maranatha*, *supra*, 158 Cal.App.4th at pp. 1088-1089.)  As part of that duty, public officials must be allowed to defend, in public, their policy decisions.  (See *ibid.*; see also *Tutor-Saliba Corp. v. Herrera* (2006) 136 Cal.App.4th 604, 615 [city attorney had the authority if not the duty to express opinion about litigation he initiated on behalf of city].)  Here, Reynolds made a policy decision to terminate the Jelly's lease and, as part of her duties, gave an explanation for her decision that was conveyed to the public.

Appellants insist that respondents failed to establish Reynolds's statements were the product of discretionary policymaking.  (See *Neary v. Regents of University of California* (1986) 185 Cal.App.3d 1136, 1143 [public official's declaration stating legal conclusion that release of report was a policy decision was insufficient to establish official duty privilege].)  They note that Reynolds, in her declaration, does not mention lease violations as a reason for terminating the lease.  That reason is recounted, second hand, in Martin's declaration.  Appellants further believe "no one who gave any consideration to the issue could credibly accuse Jelly's of illegally allowing dancing or live entertainment, given its plain lease terms and 15-year history."

On the contrary, a cursory review of the lease raises questions as to whether it permitted dancing or live entertainment.  But what the lease allowed or did not allow, or the effect of acquiescence by Port officials, are questions not material to this appeal.[4]  What is important is that the record shows the Jelly's lease became controversial, whether as a result of the shootings, or, as appellants allege, their complaints about the Port's sewage system.  Reynolds made a decision to terminate the lease.  Reynolds spoke to Martin and gave her the reasons for terminating the lease, which included Reynolds's

_____

[4] In the same vein, respondents argue the Port officials' statements regarding the lease were not defamatory because they were true.  (*Campanelli v. Regents of University of California* (1996) 44 Cal.App.4th 572, 581 [truth is absolute defense to any libel action].)  The trial court, in granting the motion to strike, did not rely on this argument.  We, too, decline to wade into an unnecessary thicket of contract interpretation.

11

belief that Jelly's was not complying with its lease. Reynolds's statement of reasons was protected by the official duty privilege.

### 3. *Appellants Were Limited Public Figures*

The trial court found that with respect to statements made by Martin, appellants were limited public figures. A public figure must prove an alleged defamatory statement was made with actual malice—that the defendant knew the statement was false or made the statement with reckless disregard of whether it was false or not. (*Khawar v. Globe Internat., Inc.* (1998) 19 Cal.4th 254, 262-263.) This elevated standard flows from federal constitutional limits on state defamation law. (See *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 264-265; *Curtis Publishing Co. v. Butts* (1967) 388 U.S. 130, 154-155.)

Some individuals occupy positions of such persuasive power and influence that they are considered public figures for all purposes. (*Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 345.) A nominally private figure, however, can become a public figure for a limited range of issues by voluntarily injecting him or herself into a particular public controversy. (*Id.* at p. 351.) Of course, mere involvement in a matter the media deems to be of interest to the public does not, in and of itself, make a person a public figure. (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 254.) "[W]hen called upon to make a determination of public figure status, courts should look for evidence of affirmative actions by which purported 'public figures' have thrust themselves into the forefront of particular public controversies." (*Id.* at pp. 254-255.) Whether a plaintiff in a defamation action is a public figure is a question of law. (*Khawar v. Globe Internat., Inc.*, *supra*, 19 Cal.4th at p. 264.)

California courts have examined three factors to determine whether an individual is a limited public figure. "First, there must be a public controversy, which means the issue was debated publicly and had foreseeable and substantial ramifications for nonparticipants. Second, the plaintiff must have undertaken some voluntary act through which he or she sought to influence resolution of the public issue. In this regard it is sufficient that the plaintiff attempts to thrust him or herself into the public eye. And

12

finally, the alleged defamation must be germane to the plaintiff's participation in the controversy." (*Ampex Corp. v. Cargle* (2005) 128 Cal.App.4th 1569, 1577, citing *Copp v. Paxton* (1996) 45 Cal.App.4th 829, 845-846.)

We have already identified the principal public controversy involving Jelly's that led to the termination: violence on its leased Port property. In addition, Jelly's itself admits it injected an issue into the public domain as to whether the Port failed adequately to respond to complaints regarding its sewage system. These are matters of clear public interest to the San Francisco community.

Moreover, appellants deliberately added to the public debate concerning its relationship with the Port and its leasehold interest when they attempted to use several methods to sway public opinion and to influence public officials to resolve the controversies in their favor. For example, appellants met with the police to develop safety measures. The Entertainment Commission held at least one hearing on violence around Jelly's, and it appears appellants persuaded that commission to allow Jelly's to continue to operate. Furthermore, appellants attempted to rally public support through an online petition and an organized protest. The July 28, 2010 Bay City News article regarding the mobilization of supporters of Jelly's included comments from appellants' attorney, who defended Jelly's and contested the Port officials' statements. (See *Rudnick v. McMillan* (1994) 25 Cal.App.4th 1183, 1190 [plaintiff can become limited public figure by voluntary act of discussing matter with the press].) The article also noted that an online petition, linked to the Jelly's website, had been electronically signed by 282 people.

Therefore, the record amply supports the conclusion that appellants intentionally thrust themselves into the public eye. Their reason for doing so was legitimate and understandable—to protect their business. The Port officials' alleged defamatory statements, however, were made in the course of their duties and were germane to the controversy over whether appellants should be allowed to continue to lease Port property. Under these circumstances, appellants were indeed limited public figures for purposes of defamation law, as correctly found by the trial court.

Nevertheless, appellants argue this is a case of their first being made public figures based on the Port's defamatory statements; their defensive actions came only later. (See *Hutchinson v. Proxmire* (1979) 443 U.S. 111, 135 [those charged with defamation cannot by their own conduct create their own defense by making the claimant a public figure].)

Appellants' argument is inconsistent with the allegations of their FAC, and with the evidence submitted in connection with the motion to strike. For example, appellants alleged that respondents retaliated against them for exercising their First Amendment rights: "[Respondents'] attempts to evict Jelly's, and [respondents'] refusal to fix the sewage pipes in the surrounding area . . . are adverse actions taken in retaliation against Jelly's communications with the Port and with the Press concerning serious problems with the Port's sewage system."

Thus, according to their own pleading, appellants initiated the controversy by going to the media to complain about the Port's sewage system. It is only after this occurred that appellants allege respondents retaliated by terminating the lease. Of course, the complete record paints a slightly different picture, showing that it was the fatal shooting, not sewer issues, that led to appellants' need to defend their business. In either case, however, the timing of the alleged defamatory statements in the sequence of events indicates that the reasons for Jelly's public controversy, be it violence associated with the club's operations, or complaints about the Port's sewer system, predated the termination of the lease, and the alleged defamatory statements by Reynolds and Martin.

For these reasons *Hutchinson v. Proxmire*, *supra*, 443 U.S. 111, a case relied on by appellants, is not applicable. There, the plaintiff professor was forced to defend himself against statements that his government-funded research activities were a waste of money. Up to that point, the professor had labored in relative obscurity and would not have been in the public eye but for the statements of his detractors. (*Id.* at p. 135.) When the defendants singled out his research for scorn, the professor responded. The fact that the press reported his response to his detractors did not make him a public figure. (*Id.* at pp. 135-136.)

14

More germane are cases relied on by respondents comparing appellants to other nominally private individuals who became public figures by lobbying on behalf of their businesses. (See *Mosesian v. McClatchy Newspapers* (1991) 233 Cal.App.3d 1685, 1701 [applicant for horse racing license who thrusts himself into center of dispute to influence the decision-makers steps from a cloak of privacy into public view]; *Hofmann Co. v. E. I. Du Pont de Nemours & Co.* (1988) 202 Cal.App.3d 390, 404 [real estate developer who sought to influence public officials and affect the public decision process for determining land use possesses attributes of a public figure].)

Therefore, we conclude that for purposes of the defamation claim appellants were limited public figures, and thus, were required to prove actual malice in order to prevail.

### 4. No Evidence of Malice

Appellants contend they made a prima facie showing of actual malice because no Port official could credibly assert Jelly's was violating its lease. We have already rejected this argument (see part III.C.2, ante). What uses the lease permitted is an unresolved, disputed legal issue with no clear answer.

Other than the unjustified assumption that the breach of the lease controversy proved malice, the record is devoid of any evidence that Martin (or Reynolds) knew her

15

statements regarding the Jelly's lease were false, or that she acted with reckless indifference to the truth or falsity of her statements.[5]

## D. Additional Discovery

Appellants lastly contend that the trial court improperly denied their request to depose Reynolds based on the mistaken belief that appellants had not requested permission for the deposition in their opposition papers. From this appellants argue the trial court failed to exercise its discretion on their discovery request. They believe the need to depose Reynolds is "plain." We disagree.

The need to depose Reynolds is not plain, and neither was appellants' request to depose her. Appellants' opposition points and authorities included a section entitled "Plaintiff [*sic*] Should Be Allowed to Conduct Discovery." In that section, they asked for permission to depose Martin, not Reynolds. Buried in a footnote in a different section of the brief is a conditional request to depose Reynolds, with no detailed explanation as to why her deposition was necessary on the defamation claim.

Under the circumstances, the trial court was justified in concluding appellants had not properly sought permission to depose Reynolds. In any case, appellants' request was patently insufficient to demonstrate good cause to depose Reynolds, let alone an abuse of discretion to deny them this discovery.

---

[5] Appellants request judicial notice, for the first time in this court, of a document entitled "Port of San Francisco Tenant in Good Standing Policy." According to appellants, this two-page document was posted on the Port's website. There is no statement as to when this policy was in effect. The purported relevance of this document is that it refutes respondents' claim that the Port officials' statements were true. As we do not decide that issue in this appeal, it follows that the document is not relevant to this appeal. (See *Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063 [Supreme Court declines to notice material that has no bearing on legal question at hand], overruled on other grounds in *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1276.) In addition, the only legal basis for noticing this document advanced by appellants is Evidence Code section 452, subdivision (b): "Regulations and legislative enactments issued by or under the authority of the United States or any public entity in the United States." Appellants fail to show this policy is a regulation or legislative enactment. For all these reasons, we deny the request for judicial notice.

Section 425.16, subdivision (g), provides for a stay of discovery upon the filing of an anti-SLAPP motion to strike. The court may lift the stay for limited discovery on noticed motion and for good cause shown. (*Ibid.*) The default rule, therefore, is that absent a showing of good cause, discovery is closed until the special motion is decided and the litigation allowed to proceed, if at all. (*Paterno v. Superior Court* (2008) 163 Cal.App.4th 1342, 1348-1349; see also *Price v. Stossel* (C.D.Cal. 2008) 590 F.Supp.2d 1262, 1266-1267.)

Appellants filed no formal motion for discovery. Assuming the request to depose Reynolds in the opposition points and authorities satisfied the requirement for a noticed motion, appellants vague desire to question Reynolds on her knowledge of the use of the leased premises did not demonstrate good cause to lift the stay of discovery. It is not an abuse of discretion to deny discovery requested without an adequate explanation of why the discovery is needed and what additional facts the moving party expects to discover. (*1-800 Contacts, Inc. v. Steinberg* (2003) 107 Cal.App.4th 568, 593-594.)

## IV.

## DISPOSITION

The judgment is affirmed.

17

_____
RUVOLO, P. J.


We concur:


_____
RIVERA, J.


_____
HUMES, J.